[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14074
_____

D.C. Docket No. 4:10-cv-00423-RH-CAS

ANDREW NATHAN WORLEY,
PAT WAYMAN, et al.,

Plaintiffs - Appellants,

versus

FLORIDA SECRETARY OF STATE,
JORGE L. CRUZ-BUSTILLO, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 14, 2013)

Before MARTIN and ANDERSON, Circuit Judges, and VINSON,[*] District Judge.

MARTIN, Circuit Judge:

This lawsuit challenges certain Florida election laws requiring groups who spend money to influence elections to form "political committees" which must disclose how much they spend and whose money they are spending.  This action also seeks to invalidate the requirement that a political committee's ads include an announcement identifying the sponsor of the ad.  See generally Fla. Stat. § 106.011 et seq. (2012) (the Florida Campaign Financing statutes).

The District Court upheld the Florida statutes and that ruling is the subject of this appeal.  Specifically, the District Court found no constitutional impediment to the Florida Campaign Financing statutes as they apply to a ballot issue election.  In so holding, the District Court validated Florida's registration, bookkeeping, and reporting requirements together with advertising disclaimer requirements placed on groups who spend money to influence ballot issue elections.

Because we are reviewing the District Court's ruling on cross motions for summary judgment, we review it de novo.  Owen v. I. C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  We have carefully studied the constitutional issues as well as the record in this case, and for the reasons that follow, we affirm the District Court's ruling.

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

## I. BACKGROUND

Andrew Nathan Worley, Pat Wayman, and John Scolaro (Challengers) wanted to join Robin Stublen—one of the original plaintiffs in the suit below—to oppose a collection of statutes known as "Amendment 4" in Florida's 2010 general election. Challengers say they wanted to enhance their speech by pooling their money to buy radio ads. They planned to have each member of their group contribute $150 so they would have at least $600 to spend on thirty-second radio ads setting out five reasons to oppose Amendment 4. They also wanted to "pass the hat" to raise and spend more money if possible.

It is true, as Challengers say, that even if they had raised and spent only their own $600, they would have met the definition of a "political committee"—or PAC—under Florida law. See Fla. Stat. § 106.011(1)(a) (defining a "political committee" to include two or more individuals who accept contributions of—or spend—more than $500 in a year to expressly advocate the election or defeat of a candidate or the passage or defeat of a ballot issue). It is also true that once Challengers became a PAC under the statutes, there were a number of requirements they had to meet. First and foremost, Florida PACs must disclose their donors who seek to influence Florida elections. See generally id. § 106.07 (describing reporting requirements).

The regulations also oblige a Florida PAC to:

3

- register with the state within 10 days after it is organized or, if it is organized within ten days of an election, register immediately, id. § 106.03(1)(a);

- appoint a treasurer and establish a campaign depository, id. § 106.021(1)(a);

- deposit all funds within five business days of receipt, id. § 106.05;

- make all expenditures by check drawn from the campaign account, id. § 106.11(1)(a);

- keep "detailed accounts" of receipts and expenditures, current to within no more than two days, id. § 106.06(1);

- maintain records for at least two years after the date of the election to which the accounts refer, id. § 106.06(3);

- file regular reports with the Division of Elections, itemizing every contribution and expenditure, small or large, id. § 106.07(4)(a);[1] and

- submit to random audits by the Division of Elections, id. § 106.22(10).

Florida PACs may not accept anonymous contributions in any amount or take cash contributions over fifty dollars. Id. §§ 106.07(4)(A), 106.09. But there is no limit on how much a Florida PAC can raise or spend. The information PACs are required to disclose is available to the public on the website of the Florida Division of Elections. See About Campaign Finance Database, Florida Division of Elections, http://election.dos.state.fl.us/campaign-finance/cam-finance-data.shtml (last visited May 30, 2013).

---

[1] Twenty-four states have ballot issue elections. Ballot Initiative Primer, CitizensinCharge.org, http://www.citizensincharge.org/learn/primer (last visited May 30, 2013). Four, including Florida, have no minimum threshold for reporting contributions to, or expenditures by, PACs. Alaska Stat. Ann. § 15.13.040(b)(2) (2012); Mich. Comp. Laws Ann. § 169.226(e) (2012); and Ohio Rev. Code Ann. § 3517.10(b)(4)(b) (2012).

Challengers also want to invalidate the requirement that Florida speakers, including PACs, who spend money on an election identify themselves in their political ads.  See Fla. Stat. § 106.143(1)(c)–(d).  As with the disclosure requirements, Challengers would also be governed by this provision.  This means they would have to include a short disclaimer in each of their radio ads.

Challengers brought this action to vindicate their view that these regulations are unduly burdensome and had chilled their speech, ultimately causing them to abandon their efforts.  First, Challengers say they did not have time to "learn and comply with the many regulations," and they were rendered "unable to speak." For example, Challenger Pat Wayman, "[d]espite having worked in a law office . . . found the legal requirements confusing and did not believe that she could balance the time required to serve as a political-committee treasurer with her other responsibilities."  Election officials acknowledge that the laws were complex, and that state officials newly working with the laws need months of study to become comfortable with them.

Second, Challengers did not want to identify themselves in their radio ads. Rather, they wanted to use all of their airtime for their message alone, so it could be evaluated solely on the basis of its content.  They calculated that a disclaimer would take at least six seconds to read, thus forcing them to shorten their political

5

message by twenty percent.  Alternatively, they would have to buy fewer, longer

ads to accommodate the time needed for the disclaimer.

Shortly before the 2010 election, Challengers brought this action protesting

Florida's campaign finance disclosure and disclaimer scheme both facially and as

applied to them—a small, grassroots group spending in a ballot issue election.

They rely upon the Supreme Court's ruling in Citizens United v. Federal Election

Commission, 558 U.S. 310, 130 S. Ct. 876 (2010), to support their argument that

the Florida scheme unconstitutionally burdens their freedom of speech.[2]

The District Court granted summary judgment to Florida with respect to the

disclosure and disclaimer requirements.  However, the District Court found

Florida's ban on contributions received in the last five days before an election to be

---

[2] Though the 2010 election has long passed, Challengers are politically active and say they intend to engage in similar political activity in the future.  The parties do not dispute that this case is ripe for adjudication.  See Sosna v. Iowa, 419 U.S. 393, 401–02, 95 S. Ct. 553, 558–59 (1975) (explaining that a case remains ripe where the alleged harm is "capable of repetition, yet evading review" because there was insufficient time to litigate the original challenge and because there is a reasonable expectation that the same party will be harmed in the same way again) (quotation marks omitted).

Also, Challengers continue to say that the Florida Campaign Financing statutes are defective both facially and as applied.  However, the record before us is not sufficient to establish the nature and scope of Challengers' activity.  As the District Court remarked, "we're not [necessarily] talking about the $600 they wanted to spend last time" because Challengers simply argued, with little specificity, that "they want to do this again."  Neither is the record developed about how much money Challengers plan to or will raise by soliciting contributions. At oral argument, their counsel would not limit the extent of Challengers' proposed election spending, at one point admitting that "well, if someone gave them a million dollars, they would be happy to spend that."

Based on the record now before us, we have analyzed this case as a facial challenge to the Florida Campaign Financing statutes made by groups spending to influence ballot issue elections as opposed to candidate elections.

unconstitutional, thus vindicating Challengers' position in that regard.  See Fla.

Stat. § 106.08(4).  The State did not appeal that ruling.

## II. FLORIDA'S DISCLOSURE SCHEME

Challengers argue that the District Court was wrong to examine Florida's PAC

regulations under exacting scrutiny, rather than strict scrutiny.  Challengers also

contest the District Court's ruling that these regulations are constitutional in the

context of a ballot issue election, arguing that the government lacks an

"informational interest"[3] in requiring disclosure for ballot initiatives.

### A.  What Level of Scrutiny?

The Supreme Court has held that "[l]aws that burden political speech are

subject to strict scrutiny, which requires the Government to prove that the

restriction furthers a compelling interest and is narrowly tailored to achieve that

interest."  Citizens United, 558 U.S. at 340, 130 S. Ct. at 898 (quotation marks

omitted).  "At the same time, [the Supreme Court has] subjected strictures on

campaign-related speech that [it] found less onerous to a lower level of scrutiny

and upheld those restrictions."  Arizona Free Enter. Club's Freedom Club PAC v.

Bennett, ___ U.S. ___, ___, 131 S. Ct. 2806, 2817 (2011).  On this subject,

Citizens United offered the following guidance: "Disclaimer and disclosure

---

[3] As the Supreme Court has done, we will refer to a state's interest in providing information to the electorate as the state's "informational interest."  See, e.g., Citizens United, 558 U.S. at 369, 130 S. Ct. at 915.

7

requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'  The Court has subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  558 U.S. at 366–67, 130 S. Ct. at 914 (citations omitted); see also Doe v. Reed, ___ U.S. ___, ___, 130 S. Ct. 2811, 2818 (2010) (listing "precedents considering First Amendment challenges to disclosure requirements" analyzed under "exacting scrutiny").

Challengers draw their argument from Citizens United, stating that the PAC regulations "put [them] in the same position that corporate shareholders and managers were in before Citizens United[:] . . . If Plaintiffs wish to speak collectively, they must either speak through a heavily regulated PAC, or not at all." Based on this, they say Florida's PAC regulations must be reviewed under strict scrutiny.  It is true that in Citizens United, the Supreme Court used strict scrutiny when it struck down a law that prohibited corporations from spending money from their corporate treasury to independently advocate for or against a candidate.  The Court characterized this prohibition, 2 U.S.C. § 441b (2006), as a ban on speech even though corporations could, under the law, establish and speak through a PAC. Citizens United, 558 U.S. at 337–40, 130 S. Ct. at 897–99.  In support of their argument here, Challengers say that the Supreme Court found the rules they

considered in Citizens United to be a "ban" on speech for two independent reasons: 1) because the corporation could not itself speak, and 2) because PACs were overregulated, burdensome alternatives. See id. at 337–39, 130 S. Ct. at 897–98. With this reading in mind, Challengers urge that the Citizens United decision means "federal PAC requirements"—and by extension the "materially identical" regulations in this case—"must be reviewed with strict scrutiny."

Challengers' attempt to analogize the corporate expenditure ban in Citizens United to Florida PAC regulations misses the mark in at least four ways. First, Part IV of the Citizens United decision made clear that disclosure and disclaimer regimes are subject to "exacting scrutiny," even where those regimes have costs that potentially "decrease[] both the quantity and effectiveness of the group's speech." 558 U.S. at 366, 368, 130 S. Ct. at 914–15.

Citizens United echoed Buckley v. Valeo, where the Supreme Court distinguished between limits on political spending, which "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached" and disclosure regulations, which "impose no ceiling on campaign-related activities." Buckley v. Valeo, 424 U.S. 1, 19, 64, 96 S. Ct. 612, 634, 656 (1976) (per curiam). Although the Court recognized that disclosure carries with it "significant encroachments on First Amendment rights," disclosure requirements are examined under exacting scrutiny

9

because they "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption . . . " Id. at 64, 68, 96 S. Ct. at 656, 658.

Challengers minimize Part IV of Citizens United by arguing that it is a "separate discussion[] of disclosure" relating only to federal electioneering communication disclosure, rather than the "uniquely burdensome" PAC disclosure. But what the Supreme Court said in Part IV is not so easily set aside. The Court's description of PAC requirements as burdensome does nothing to alter its holding in Part IV that disclosure schemes are subject to exacting scrutiny. Citizens United, 558 U.S. at 366–67, 130 S. Ct. at 914; see also Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544, 549 (4th Cir. 2012) ("[A]fter Citizens United, it remains the law that provisions imposing disclosure obligations are reviewed under . . . 'exacting scrutiny.'").

Second, Citizens United found the "prohibition on corporate independent expenditures" to be an outright ban on speech, but made no such finding about federal PAC requirements. 558 U.S. at 339, 130 S. Ct. at 898. More to the point, the Court analyzed the prohibition on political contributions by corporations (2 U.S.C. § 441b) under strict scrutiny because it entirely prevented a corporation from speaking as a corporation, and the only justification given for the ban was that it was "corporate speech." Id. at 337–43, 130 S. Ct. at 897–900. In this context, strict scrutiny applied "notwithstanding the fact that a PAC created by a

10

corporation can still speak" because "[a] PAC is a separate association from the corporation."  Id. at 337, 130 S. Ct. at 897.  "So the PAC exemption from § 441b's [corporate treasury] expenditure ban, § 441b(b)(2), [still did] not allow corporations to speak."  Id. (emphasis added).  It is true, of course, that Citizens United discussed PAC regulations as "burdensome alternatives."  Id.  But nowhere did Citizens United hold that PAC regulations themselves constitute a ban on speech or that they should be subject to strict scrutiny.  Cf. SpeechNow.org v. FEC, 599 F.3d 686, 696–98 (D.C. Cir. 2010) (en banc) (upholding the federal PAC requirements under exacting scrutiny in the wake of Citizens United), cert. denied, Keating v. FEC, ___ U.S. ___, 131 S. Ct. 553 (2010).

In contrast with the corporations in Citizens United, Challengers are free to speak themselves.  It is only when they wish to speak collectively to influence elections that the Florida PAC regulations apply.  Challengers reject this assurance, and assert that this is the same argument made and rejected in Citizens United.  But that is not so.  Citizens United rejected the argument that an individual corporation, owned by corporate shareholders and managed by corporate managers, could be confined to speaking through a PAC or through its individual shareholders or managers.  558 U.S. at 337, 130 S. Ct. at 897.  Citizens United did not reject laws that require individuals spending collectively for the purpose of influencing an

11

election to comply with PAC regulations.  See SpeechNow.org, 599 F.3d at 696–98.

Third, Challengers' position is in conflict with cases from every one of our sister Circuits who have considered the question, all of whom have applied exacting scrutiny to disclosure schemes.  See Nat'l Org. for Marriage, Inc. v. McKee (McKee II), 669 F.3d 34, 37–40 (1st Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 163 (2012); Nat'l Org. for Marriage v. McKee (McKee I), 649 F.3d 34, 41–44, 55 (1st Cir. 2011), cert. denied, ___ U.S. ___, 132 S. Ct. 1635 (2012); Real Truth, 681 F.3d at 549; Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 471–72, 476–77 (7th Cir. 2012); Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 875 (8th Cir. 2012) (en banc); Human Life of Wash. Inc. v. Brumsickle, 624 F.3d 990, 997–99, 1005 (9th Cir. 2010), cert. denied, ___ U.S. ___, 131 S. Ct. 1477 (2011); Sampson v. Buescher, 625 F.3d 1247, 1249–50, 1261 (10th Cir. 2010); SpeechNow.org, 599 F.3d at 696.

It is worth noting from among these cases, that SpeechNow.org v. Federal Election Commission presented facts very similar to those we consider here.  In that case, five people wanted to get together and spend on an election but argued that "the additional burden that would be imposed on SpeechNow[.org] if it were required to comply with the organizational and reporting requirements applicable to political committees [was] too much for the First Amendment to bear."

SpeechNow.org, 599 F.3d at 697. SpeechNow.org was prepared to comply with reporting requirements for individuals making independent expenditures under 2 U.S.C. § 434(c), 434(g)(1)–(2), but argued against the §§ 431 and 432 burdens (on groups), such as "designating a treasurer and retaining records." Id. at 697–98. Writing for the en banc court, Judge Sentelle examined and rejected that argument under exacting scrutiny. See id. at 697–98.

Finally, to the extent Challengers seek to rely on the Eighth Circuit's opinion in Minnesota Citizens Concerned for Life, Inc. v. Swanson, it offers them little if any help. In Minnesota Citizens, the Eighth Circuit examined a law requiring every association wishing to make any independent election expenditures to "create and register its own independent expenditure political fund." 692 F.3d at 868. It is true that the Eighth Circuit questioned whether exacting scrutiny applied to laws "which subject associations that engage in minimal speech to . . . regulations that accompany status as a PAC." Id. at 875 (quotation marks and alterations omitted). But in the end, the Minnesota Citizens Court applied exacting scrutiny to examine Minnesota's political fund rules. Id. at 874–77.[4]

After considering each of Challengers' arguments, we conclude that Florida's PAC regulations are subject to "exacting scrutiny," so they must be

---

[4] But see Minn. Citizens, 692 F.3d at 880–87 (Melloy, J., concurring and dissenting, joined by Murphy, Bye and Smith, JJ.) (arguing that the "exacting scrutiny" applied by the majority required more from the government than a proper exacting scrutiny analysis).

substantially related to a sufficiently important government interest.  Citizens

United, 558 U.S. at 366–67, 130 S. Ct. at 914.

## B. Sufficiently Important Government Interest?

As the Supreme Court explained in Buckley,

> disclosure provides the electorate with information as to where
> political campaign money comes from and how it is spent by the
> candidate in order to aid the voters in evaluating those who seek
> federal office.  It allows voters to place each candidate in the political
> spectrum more precisely than is often possible solely on the basis of
> party labels and campaign speeches.  The sources of a candidate's
> financial support also alert the voter to the interests to which a
> candidate is most likely to be responsive and thus facilitate predictions
> of future performance in office.

424 U.S. at 66–67, 96 S. Ct. at 657 (quotation marks and footnote omitted).

In Citizens United, the Court upheld disclosure and disclaimer requirements

based, in part, on the "governmental interest in providing information to the

electorate."  558 U.S. at 368, 130 S. Ct. at 914.  The Court explained that "the

public has an interest in knowing who is speaking about a candidate."  Id. at 369,

130 S. Ct. at 915.  Indeed, it endorsed disclosure as a matter of sound public

policy: "The First Amendment protects political speech; and disclosure permits

citizens and shareholders to react to the speech of corporate entities in a proper

way.  This transparency enables the electorate to make informed decisions and give

proper weight to different speakers and messages."  Id. at 371, 130 S. Ct. at 916.

14

Challengers argue here that the public's right to know who is speaking about a candidate does not extend to ballot issues.  In support, Challengers say that corruption and political favoritism are notably absent in the context of ballot issue elections.  See First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 790, 98 S. Ct. 1407, 1423 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue.") (emphasis added) (citations omitted).  Against this background, Challengers tell us there is "only one interest compelling enough to justify PAC requirements: the prevention of 'quid pro quo corruption' of political candidates."  Challengers' crucial point is that voters have an interest in knowing "who is speaking about a candidate."  See Citizens United, 558 U.S. at 369, 130 S. Ct. at 915 (emphasis added).

Finally, Challengers argue that the Supreme Court has never relied on the public's right to know where there is no risk of corruption, despite having been invited to do so.  In support, Challengers point to Doe v. Reed, in which the State of Washington defended its law that allowed the names and addresses of those who had signed a petition to challenge a state law by referendum to be made public. 130 S. Ct. at 2815.  Washington said making public those who signed the petitions would combat fraud; ferret out invalid signatures; and promote transparency and accountability.  Id. at 2819.  The Supreme Court neither recognized nor invalidated Washington's informational interest in this context.  Rather, the Court

15

observed that Washington had a sufficient "interest in preserving the integrity of the electoral process," such that it did not need to "address the State's 'informational' interest." Id.

In any event, Challengers' attempt to delink the Supreme Court's acceptance of a state's informational interest from ballot issues creates problems for them. First, their argument that there can be no informational interest in the absence of a fear of quid pro quo corruption, i.e., in a ballot issue election, was rejected in Citizens United. Central to the holding of Citizens United was the Supreme Court's conclusion that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." 558 U.S. at 357, 130 S. Ct. at 909. Thus, when the Court upheld disclosure requirements even where a corporation was making only independent expenditures, it sanctioned disclosure where it found no corruption or appearance of corruption. To the extent the Court held that "the informational interest alone is sufficient to justify" disclosure, id. at 369, 130 S. Ct. at 915–16, it cannot be true that, as Challengers assert, there is no sufficient or valid interest in providing information to voters in the absence of corruption.

Second, Challengers' argument is not consistent with two cases, directly on point, in which the Supreme Court explicitly endorsed disclosure schemes as constitutional, if not beneficial, in ballot issue elections. In First National Bank of

16

Boston v. Bellotti, the Court struck down a Massachusetts statute that banned spending by banks and corporations in referendum elections on issues that did not directly affect their property. 435 U.S. at 767–68, 98 S. Ct. at 1411. It is true that Bellotti held that such limits were not warranted in a ballot issue election lacking fear of quid pro quo corruption. See id. at 789–90, 98 S. Ct. at 1423. But the Court also explained that "[c]orporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected." Id. at 792 n.32, 98 S. Ct. at 1424 n.32. The Bellotti ruling would not allow Massachusetts, in service of providing better information, to cut back on speech by banning it from a certain source: corporations. "[F]ar from inviting greater restriction of speech," explained the Court, "the direct participation of the people in a referendum, if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." Id. at 792 n.29, 98 S. Ct. at 1424 n.29 (quotation marks omitted). And the companion to this broader participation is the idea that disclosure and disclaimer rules lead to more speech and more information disseminated to the public. Thus the Supreme Court has taught that disclosure rules do promote a legitimate government interest, whether in the ballot issue or candidate election context.

17

Indeed, in Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, California, the Supreme Court again endorsed broad disclosure rules in the context of a ballot issue election. 454 U.S. 290, 298–300, 102 S. Ct. 434, 438–39 (1981). The Court noted that Berkeley voters would know "the identity of those whose money supports or opposes a given ballot measure since contributors must make their identities known under [another section] of the ordinance." Id. at 298, 102 S. Ct. at 438. What the Court objected to was "restricting contributions" in the absence of quid pro quo corruption. Id. at 297, 102 S. Ct. at 438 (emphasis added) (quotation marks omitted). The Court held that the contribution limits imposed by Berkeley were unnecessary because "[t]he integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed . . . [and] if it is thought wise, legislation can outlaw anonymous contributions." Id. at 299–300, 102 S. Ct. at 439. Citizens Against Rent Control clearly recognizes the informational interest Florida advances before us.

Challengers argue that the ballot issue case more on point is McIntyre v. Ohio Elections Commission, 514 U.S. 334, 115 S. Ct. 1511 (1995). In her case, and in contrast to ours, Mrs. McIntyre represented only herself in handing out handbills she had composed, and which opposed a school tax referendum. Id. at 337, 115 S. Ct. at 1514. She was fined for violating an Ohio statute which

18

outlawed the distribution of anonymous campaign literature.  Id. at 338, 115 S. Ct. at 1514.  However, the Supreme Court invalidated the law requiring that political handbills contain an author disclaimer when the handbills were about "ballot issues that present[ed] neither a substantial risk of libel nor any potential appearance of corrupt advantage."  Id. at 351–52, 115 S. Ct. at 1521.  But the Court also discussed campaign finance disclosures, making it clear that "[t]hough such mandatory reporting [of the amount and use of money spent] undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings."  Id. at 355, 115 S. Ct. at 1523.  The Court contrasted the impact of disclosure rules requiring a name on a handbill with those requiring disclosure of an "expenditure."  It recognized that disclosure of expenditures is "less specific, less personal, and less provocative."  Id.  Thus, we do not find McIntyre to be as helpful to Challengers' case as they suggest.

Third, the weight of persuasive Circuit precedent cuts against the distinction between candidate elections and ballot issue elections which Challengers ask us to adopt.  See, e.g., Ctr. for Individual Freedom, 697 F.3d at 480–85; Family PAC v. McKenna, 685 F.3d 800, 803–814 (9th Cir. 2012); McKee II, 669 F.3d at 39–41; McKee I, 649 F.3d at 41–44, 55–61; Human Life, 624 F.3d at 1002–1019; cf. SpeechNow.org, 599 F.3d at 696 (where the D.C. Circuit did not consider a ballot issue election but nevertheless interpreted Buckley as having "upheld . . .

19

disclosure requirements . . . based on a governmental interest in 'provid[ing] the electorate with information' about the sources of political campaign funds, <u>not just the interest in deterring corruption and enforcing anti-corruption measures</u>" (emphasis added)).  The First and the Ninth Circuits have even described the informational interest as "compelling" in the ballot issue context.  <u>McKee II</u>, 669 F.3d at 40; <u>McKee I</u>, 649 F.3d at 57; <u>Human Life</u>, 624 F.3d at 1005–06.

Our sister Circuits have offered thoughtful explanations for why disclosure advances government interests in the ballot issue context.  For example, the Seventh Circuit explained its belief that:

> Educating voters is at least as important, if not more so, in the context of initiatives and referenda as in candidate elections.  In direct democracy, where citizens are responsible for taking positions on some of the day's most contentious and technical issues, voters act as legislators, while interest groups and individuals advocating a measure's defeat or passage act as lobbyists.

<u>Ctr. for Individual Freedom</u>, 697 F.3d at 480 (quotation marks and alterations omitted).  The Ninth Circuit suggested that disclosure may be more useful in the context of ballot initiatives because:

> Disclosure also gives voters insight into the actual policy ramifications of a ballot measure.  Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown.  At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.  In addition, mandating disclosure of the

financiers of a ballot initiative may prevent the wolf from masquerading in sheep's clothing.

Family PAC, 685 F.3d at 808 (quotation marks and citations omitted).

Nevertheless, Challengers urge us to adopt the Tenth Circuit's contrary reasoning in Sampson v. Buescher. In Sampson, the Tenth Circuit recognized that with respect to "financial-disclosure requirement[s] in the ballot-issue context," the Supreme Court "has spoken favorably of such requirements." 625 F.3d at 1257. However, the Sampson Court expressed its own view that "[i]t is not obvious that there is" a "public interest in knowing who is spending and receiving money to support or oppose a ballot issue" because candidate elections are "ad hominem affairs" that require voters to "evaluate a human being," whereas ballot issue elections simply present a "choice [of] whether to approve or disapprove of discrete governmental action." Id. at 1256–57. This distinction led the Tenth Circuit to suggest that nondisclosure would actually be a net positive because it would "require the debate to actually be about the merits of the proposition on the ballot," not the people funding it. Id. at 1257.

In the same way the Supreme Court in Citizens United rejected the idea that the messenger distorts the message, see 558 U.S. at 349–51, 130 S. Ct. at 904–905, we reject the notion that knowing who the messenger is distorts the message. The premise of the antidistortion argument rejected in Citizens United is that corporations use the corporate form to accumulate wealth, which allows them to

21

promote ideas "that have little or no correlation to the public's support." Id. at 348, 130 S. Ct. at 903 (citation omitted). The Court disposed of this argument, saying that "[p]olitical speech is indispensable to decisionmaking in a democracy," whether "the speech comes from a corporation" or "an individual." Id. at 349, 130 S. Ct. at 904 (citation omitted). Citizens United does not command states to enact disclosure laws, but it does suggest that First Amendment analysis must be wary of the argument that less speech is more. The Circuits recognizing a sufficient informational interest in the ballot issue context have the better arguments.

Finally, we note that even in Sampson, the Tenth Circuit did not invalidate a law that required disclosures in the ballot issue context. Instead it held the law unconstitutional as applied to those plaintiffs because "the governmental interest in imposing . . . regulations is minimal, if not nonexistent, in light of the small size of the contributions." Sampson, 625 F.3d at 1261. Thus, even Sampson does not, in the end, call into question that there could be a "sufficiently important" informational interest in requiring disclosure in the ballot issue context.

Our reading of Supreme Court and persuasive Circuit precedent compels us to conclude that promoting an informed electorate in a ballot issue election is a sufficiently important governmental interest to justify the Florida PAC regulations we consider here.

## C. Substantially Related to the Government Interest?

22

"Though possibly less rigorous than strict scrutiny, exacting scrutiny is more than a rubber stamp." Minn. Citizens, 692 F.3d at 876 (citations omitted). Exacting scrutiny requires that Florida's interest in promoting an informed electorate be "substantially related" to its PAC regulations. See Citizens United, 558 U.S. at 366–67, 130 S. Ct. at 914. Applying this standard, Florida must justify the burden its PAC regulations place on even small groups raising $500 or more by requiring that they register as political committees; meet ongoing reporting deadlines; and track and report all contributions, no matter how small.

Challengers argue that the law is not properly tailored because it "imposes no minimum threshold on disclosure [and] requires the disclosure of a vast amount of unnecessary information," which is burdensome, especially for grassroots groups. Challengers read precedent from our sister Circuits to favor a finding that Florida's extensive reporting obligations fail exacting scrutiny. Challengers say the facts of their case are most analogous to those in Sampson, where the Tenth Circuit found that similar PAC requirements imposed on a group that raised just $782.02 failed exacting scrutiny. Challengers also urge us to adopt the reasoning of Minnesota Citizens to find that "ongoing reporting requirements" along with "[o]ther requirements, such as requiring a treasurer, segregated funds, and record-keeping" are "unrelated" to a professed informational interest or at best "tangentially related" to that interest. 692 F.3d at 875 n.9.

23

But neither Sampson nor Minnesota Citizens is helpful to us given the nature of this challenge. As we mentioned in footnote 2, supra, we are not equipped to evaluate this case as an "as applied" challenge because the record does not tell us enough about what Challengers are doing. While Challengers have emphasized that they are merely a grassroots group of four people who want to spend a modest amount of money in a ballot issue election, they also emphasize their desire to solicit contributions. We know little if anything about how much money they intend to raise or how many people they wish to solicit. We will not speculate about their future success as fundraisers. Based on the record we do have, we consider this challenge to the Florida PAC regulations to be a facial challenge. This means that Challengers cannot prevail unless they can prove "that no set of circumstances exists under which the [regulations] would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987). They have not carried that burden here.

First, the District Court got it right when it said that the organizational requirements in Florida's PAC regulations do not generally impose an undue burden on PACs. We agree with the District Court that these regulations "require little more if anything than a prudent person or group would do in these circumstances anyway." Certainly a group wanting to raise and spend money to influence an election likely would: "put someone in charge of the money" and

24

decide where to keep it, see Fla. Stat. § 106.021(1)(a) (requiring that Florida PACs appoint a treasurer and open a separate bank account); avoid loss or comingling of funds by depositing money into that account promptly, see id. § 106.05 (requiring Florida PACs to deposit all funds within five business days of receipt); keep good records, see id. § 106.06(1), (3) (requiring Florida PACs to keep updated records); and, to promote good recordkeeping, disburse funds by check rather than cash, see id. § 106.11(1)(a) (requiring Florida PACs to disburse funds by check). See SpeechNow.org, 599 F.3d at 696–98 (holding that similar organizational requirements in the federal PAC regulations were not unconstitutionally burdensome).

In much the same way, the reporting and registration requirements are not unduly burdensome. Registration involves submitting a "statement of organization," see Fla. Stat. § 106.03(1)(a), which requires filling out four pages of basic information. Florida PACs must file periodic reports, see id. § 106.07(3), but reporting requirements are allowed under our Constitution, and if there is something to report, it would make sense that Challengers would be tracking contributions anyway. Florida PACs may be subjected to random audits, see id. § 106.22(10), but this again is a small burden—especially where the PAC already tracks the money it gets in and gives out. Finally, the ongoing reporting requirements are not especially burdensome given that Florida law allows PACs to

terminate more easily than federal PAC requirements allow. Compare Fla. Stat. § 106.03(2)(j) (requiring a Florida PAC to state how it will dispose of its residual funds if it terminates) and id. § 106.03(5) (requiring a Florida PAC that "disbands or determines it will no longer receive contributions or make expenditures" to "notify the agency or officer with whom such committee is required to [register]"), with 11 C.F.R. §§ 102.3(a)(1), 116.7 (allowing a committee to terminate only upon filing a written notice with the Federal Election Commission (FEC) or other agency specified under 11 C.F.R. § 105, and only if the PAC settles "outstanding debts and obligations") and id. at § 102.4 (outlining the FEC termination process).

Second, Florida's PAC regulations advance the government's informational interest even as they apply to small groups in Florida and require the tracking of any and all donations. Albeit in dicta, in Let's Help Florida. v. McCrary, the Fifth Circuit endorsed Florida's then-existing PAC regulations as a suitable alternative to contribution limits insofar as they helped to inform the electorate about spending in campaigns. 621 F.2d 195, 200–01 (5th Cir. 1980).[5] And at least one court has remarked that "[i]t is far from clear . . . that even a zero-dollar disclosure threshold would succumb to exacting scrutiny." Family PAC, 685 F.3d at 809 n.7.

Challengers' pleas on behalf of a few people pooling a small amount of money ring a bit hollow to the extent that they refuse to foreclose their option for

---

[5] In Bonner v. City of Prichard, we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

raising big money.  Now Challengers present themselves as intending to spend only $600.  However, as we noted above, they also acknowledged at oral argument that if they received a $1 million donation, they would happily spend it. Challengers argue that the government may only regulate "established" groups. However, requiring registration by groups who start with as little as $500 also advances the government's informational interests.  Indeed, we know that federal PAC requirements kick in once a group has raised $1000 during a calendar year to influence elections and that these requirements have not been held unconstitutional.  See 2 U.S.C. § 431(4)(a) (2012); Buckley, 424 U.S. at 79–80, 96 S. Ct. at 663–64; cf. SpeechNow.org, 599 F.3d at 696–98 (concerning a PAC formed by just five individuals).

Florida also advances its informational interest through a first-dollar disclosure threshold because knowing the source of even small donations is informative in the aggregate and prevents evasion of disclosure.  As the First Circuit explained in National Organization for Marriage, Inc. v. McKee (McKee II), "[t]he issue is . . . not whether voters clamor for information about each 'Hank Jones' who gave $100 to support an initiative.  Rather, the issue is whether the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill."  669 F.3d at 41 (quotation marks omitted).  To reiterate, we recognize that the

27

government's informational interest may not be greatly advanced by disclosing a single, small contribution. However, disclosure of a plethora of small contributions could certainly inform voters about the breadth of support for a group or a cause. As Florida also points out, the first-dollar threshold prevents a big donor from thwarting the State's informational interest entirely by making a number of small donations.

Finally, Supreme Court and Circuit precedent has "consistently upheld organizational and reporting requirements against facial challenges," SpeechNow.org, 599 F.3d at 696, in part because crafting such disclosure schemes is better left to the legislature. While we hold that the disclosure scheme survives exacting scrutiny, we nevertheless find the discussion in National Organization for Marriage v. McKee (McKee I) assessing disclosure thresholds to be instructive:

> [Plaintiffs] argue[] that Maine lacks a "sufficiently important" interest in the $100 threshold at which the reporting requirement adheres, and, alternatively, that the threshold lacks a "substantial relation" to a sufficiently important governmental interest. [Plaintiffs'] argument operates from a mistaken premise; we do not review reporting thresholds under the "exacting scrutiny" framework. In Buckley, facing a similar challenge to a $10 threshold for a recordkeeping provision and a $100 reporting threshold, the Supreme Court noted that the choice of where to set such monetary thresholds "is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion." The Court concluded that, although there was no evidence in the record that Congress had "focused carefully on the appropriate level at which to require recording and disclosure," and despite the fact that the low thresholds might "discourage participation by some citizens in the political process," it could not say that "the limits designated are

28

wholly without rationality." The Court thus upheld [the Federal Election Campaign Act's] recordkeeping and reporting thresholds.

> Following Buckley, we have granted "judicial deference to plausible legislative judgments" as to the appropriate location of a reporting threshold, and have upheld such legislative determinations unless they are "'wholly without rationality.'"

649 F.3d at 60 (citations omitted); see also Family PAC, 685 F.3d at 811 ("[D]isclosure thresholds . . . are inherently inexact; courts therefore owe substantial deference to legislative judgments fixing these amounts."). With this in mind, we cannot say that the PAC regulations are too broad to be substantially related to Florida's informational interests.

Third, Challengers' arguments that Sampson and Minnesota Citizens dictate an outcome in their favor make little sense given the nature of their appeal. In Sampson, the Tenth Circuit held that application of Colorado PAC requirements to a group of individuals who reported "nonmonetary contributions (signs, a banner, postcards, and postage) totaling $782.02" for a ballot issue election was unconstitutional.[6] 625 F.3d at 1252. The law in that case imposed registration requirements on groups raising or spending over $200 and required disclosure for all donations over $20. Id. at 1249. But in any event, the Tenth Circuit did not

---

[6] After the plaintiffs in Sampson received a complaint from the Colorado Secretary of State, they raised cash in the amount of $1,426, and paid $1,178.82 of that amount for attorney fees. 625 F.3d at 1260 & n.5. The ballot issue they opposed was a proposal to annex the neighborhood of Parker North into the Town of Parker. Id. at 1251. The annexation measure was defeated by a vote of 351 to 21 prior to the Tenth Circuit's ruling in Sampson, id., and there was no indication that the Sampson plaintiffs intended to involve themselves in any future ballot issues. See generally id. at 1251–54.

facially strike down that law, explaining that "[w]e do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures.  The case before us is quite unlike ones involving the expenditure of tens of millions of dollars. . . ."  Id. at 1261.

Here, Challengers openly acknowledge they seek to raise more money in the future.  This fact distinguishes them from the Sampson plaintiffs, who never expressed a desire to continue soliciting contributions.  See generally id. at 1251– 54.  Thus, our ruling in favor of Florida does not conflict with Sampson, and we need not reach the question of whether the statute is constitutional as applied to four individuals raising only $600.

Neither is Minnesota Citizens of assistance to Challengers.  Minnesota Citizens limited its holding to ongoing reporting requirements for associations spending to influence elections that did not otherwise qualify as PACs under Minnesota law.  See 692 F.3d at 877.  The Eighth Circuit left no question that groups "whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question," like Challengers here, would have to comply with the state political fund disclosure requirements challenged in Minnesota Citizens.  Id. at 877 n.11 (quotation marks omitted).[7]

---

[7] The law in Minnesota Citizens was flawed in part because "Minnesota ha[d] not stated any plausible reason why continued reporting from nearly all associations, regardless of the

Challengers are free to petition the legislature to reset the reporting requirements for Florida's PAC regulations, but we decline to do so here. Challengers' facial challenge cannot succeed because Florida has adequately demonstrated that existing PAC regulations are substantially related to a sufficiently important government interest.[8]

### III. FLORIDA'S ADVERTISING DISCLAIMER REQUIREMENT

Challengers also contest the District Court's finding that Florida's advertising disclaimer requirement is constitutional in ballot issue elections. Challengers reference McIntyre, in which the Supreme Court explained that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." 514 U.S. at 342, 115 S. Ct. at 1516. In

---

association's major purpose, [was] necessary to accomplish [its] interests." 692 F.3d at 877 (second emphasis added).

It is worth noting that this lack of a "major purpose" requirement for regulation was also the way in which the Minnesota Citizens Court distinguished that case from SpeechNow.org. Id. at 875 n.10. But in Florida, in contrast to Minnesota, for all elections, including ballot issue elections, "[c]orporations regulated by chapter 607 or chapter 617 or other business entities formed for purposes other than to support or oppose issues or candidates" are, in fact "not considered political committees." Fla. Stat. § 106.011(1)(b). In other words, there is no Minnesota Citizens problem with a lack of a "major purpose" test because the law does not "impose[] . . . requirements on all associations, regardless of the association's purpose." 692 F.3d at 875 n.10.

[8] While we decline to address Florida's failure to set minimum thresholds on disclosure, we do have concerns about the burdens that the lack of these minimums place on truly small grassroots groups with little experience and little money. However, because this appeal is properly viewed as a facial challenge, the issue need not be decided here

31

Citizens United, however, the Supreme Court expressly rejected the argument that a broadcast advertisement disclaimer requirement was unconstitutional because it "decrease[d] both the quantity and effectiveness of the group's speech by forcing it to devote four seconds of each advertisement to the spoken disclaimer." 558 U.S. at 368, 130 S. Ct. at 915. The Court noted, among other things, that it had explained in Bellotti that "[i]dentification of the source of advertising may be required as a means of disclosure." Id. (quoting Bellotti, 435 U.S. at 792 n.32, 98 S. Ct. at 1424 n.32).

Nonetheless, Challengers argue that McIntyre remains good law, and dictates the demise of Florida's disclaimer requirement. Specifically, Challengers argue that under McIntyre, Florida's "simple interest in providing voters with additional relevant information," 514 U.S. at 348, 115 S. Ct. at 1520, is not a sufficient interest to burden speech significantly. Indeed, Challengers argue that the burden on their speech is greater than that placed on the pamphleteer in McIntyre, as they will probably have to decrease a thirty-second message by six seconds, resulting in a twenty percent loss in content.

Challengers say, too, that the District Court's distinguishing of McIntyre conflicted with First Amendment principles. First, Challengers argue that the District Court drew a distinction between handbills and radio ads, which was wrong because courts "must decline to draw, and then redraw, constitutional lines

32

based on the particular media or technology used to disseminate political speech." Citizens United, 558 U.S. at 326, 130 S. Ct. at 891. Second, Challengers argue that the District Court's finding that their collaborative speech did not fall within the scope of McIntyre's holding was also error because the First Amendment applies with equal force to groups and individuals. Third, Challengers object to the District Court's holding that McIntyre did not apply to them because they have no right to receive anonymous contributions to fund radio ads. Specifically, Challengers object to this holding because they argue that the Supreme Court has never found a state informational interest in the ballot issue context that could thwart anonymous contributions.

Each of Challengers' arguments fails in light of Citizens United, Bellotti, Citizens Against Rent Control, and McIntyre itself. First, Florida's disclaimer requirement is materially indistinguishable from the disclaimer requirement upheld in Citizens United. The only differences in the disclaimer requirements before us and those addressed by the Supreme Court in Citizens United are that we have a ballot issue election before us, and Challengers claim it will take them six seconds to read the disclaimer as opposed to the four seconds recited in Citizens United. See Citizens United, 558 U.S. at 366, 130 S. Ct. at 914. Citizens United upheld that disclaimer requirement without any mention of McIntyre. Id. at 366–71, 130 S. Ct. at 914–16. As we have discussed at length, Challengers' proposed

33

distinction between ballot issue elections and candidate elections is not supported by precedent and does not compel a departure from Citizens United here.

Second, a disclaimer requirement was endorsed in the ballot issue context, albeit in dicta, in Bellotti. 435 U.S. at 792 n.32, 98 S. Ct. at 1424 n.32 ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."). McIntyre did not purport to overrule Bellotti. 514 U.S. at 353–54, 115 S. Ct. at 1522–23.

Third, McIntyre was a narrow decision that expressly disavowed application to other forms of media. McIntyre limited its holding to "only written communications and, particularly, leaflets of the kind Mrs. McIntyre distributed." 514 U.S. at 338 n.3, 115 S. Ct. at 1514 n.3; see also Reed, 130 S. Ct. at 2831 n.4 (Stevens, J., concurring in part and concurring in the judgment) (explaining the limitations of McIntyre). Indeed McIntyre declined to address the constitutionality of the radio provision of the Ohio statute. 514 U.S. at 338 n.3, 115 S. Ct. at 1514 n.3. As Justice Ginsburg wrote in concurrence:

> In for a calf is not always in for a cow. The Court's decision finds unnecessary, overintrusive, and inconsistent with American ideals the State's imposition of a fine on an individual leafleteer who, within her local community, spoke her mind, but sometimes not her name. We do not thereby hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity.

Id. at 358, 115 S. Ct. at 1524 (Ginsburg, J., concurring).  McIntyre simply did not speak to disclaimers required for radio ads.

Fourth, the fact that the advertising disclaimer requirement here applies to groups that spend money in elections is important.  See McIntyre, 514 U.S. at 355, 115 S. Ct. at 1523 (describing campaign finance disclosure requirements as being less burdensome than other speech regulations).  Citizens Against Rent Control, which McIntyre did not purport to overrule, explained, albeit in dicta, that "if it is thought wise, legislation can outlaw anonymous contributions."  454 U.S. at 300, 102 S. Ct. at 439.  A disclaimer naming the PAC that purchased the ad prevents anonymous election spending.  Challengers argue that even if this is true, the disclaimer does not actually advance any interest in disclosure because all funders have to do is disclaim the name of the PAC, not a list of individual contributors.  But we reject that argument given that Florida PACs have to disclose their contributors in a public forum.  Indeed, that is what Challengers are complaining about.

Therefore, we agree with the District Court that Florida's advertising disclaimer requirement is constitutional.

## IV. CONCLUSION

For each of these reasons, the opinion of the District Court is

**AFFIRMED.**

35