**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JIMMY YAMADA; RUSSELL STEWART, *Plaintiffs*, and A-1 A-LECTRICIAN, INC., *Plaintiff-Appellant*, v. WILLIAM SNIPES, in his official capacity as chair and member of the Hawaii Campaign Spending Commission, TINA PEDRO GOMES, in her official capacity as vice chair and member of the Hawaii Campaign Spending Commission; and ELDON CHING, GREGORY SHODA and ADRIENNE YOSHIHARA, in their official capacities as members of the Hawaii Campaign Spending Commission, *Defendants-Appellees*. | No. 12-15913 D.C. No. 1:10-cv-00497-JMS-RLP |

JIMMY YAMADA; RUSSELL STEWART,

*Plaintiffs-Appellants*,

and

A-1 A-LECTRICIAN, INC.,

*Plaintiff*,

v.

WILLIAM SNIPES, in his official capacity as chair and member of the Hawaii Campaign Spending Commission; TINA PEDRO GOMES, in her official capacity as vice chair and member of the Hawaii Campaign Spending Commission; and ELDON CHING, GREGORY SHODA and ADRIENNE YOSHIHARA, in their official capacities as members of the Hawaii Campaign Spending Commission,

*Defendants-Appellees*.

No. 12-17845

D.C. No. 1:10-cv-00497-JMS-RLP

OPINION

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
October 9, 2013—Honolulu, Hawaii

Filed May 20, 2015

Before:  Alex Kozinski, Raymond C. Fisher
and Paul J. Watford, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought by two individuals and a Hawaii for-profit corporation, A-1 A-Lectrician, Inc., challenging the constitutionality of Hawaii's campaign finance laws.

During the 2010 election, plaintiff A-1 contributed over $50,000 to candidates, candidate committees and party committees.  It also purchased three newspaper advertisements.  As a result of these expenditures and contributions, A-1 was required to register as a "noncandidate committee," and was subjected to reporting and disclosure requirements (HRS § 11-302) and advertising disclaimer requirements (HRS § 11-391). A1, which plans to run similar advertisements and make similar contributions to candidates in the future, objects to both the disclaimer requirement and the noncandidate committee registration and reporting requirements.

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Addressing A-1's Fourteenth Amendment due process vagueness challenge to Hawaii's reporting and disclosure requirements, the panel held that HRS § 11-302's definitions of "expenditure," and "noncandidate committee" were not vague given the narrowing construction of the term "influence" proffered by Hawaii's Campaign Spending Commission. The panel also held that § 11-302's definition of "advertisement" was not unconstitutionally vague because read as a whole and in context it was sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what was prohibited.

Addressing the First Amendment challenges, the panel held that the registration, reporting and disclosure requirements that Hawaii places on "noncandidate committees" survived exacting scrutiny as applied to A-1. The panel held that the requirements were substantially related to Hawaii's important interests in informing the electorate, preventing corruption or its appearance, and avoiding the circumvention of valid campaign finance laws. The panel also held that Hawaii's requirement that political advertising include a disclaimer as to the affiliation of the advertiser with a candidate or candidate committee did not violate the First Amendment as applied to A-1's political advertisements.

The panel declined to consider A1's challenge to Hawaii's electioneering communication reporting requirements (HRS § 341) because it determined that A-1 was not subject to those requirements as of the date the complaint was filed.

The panel rejected A-1's First Amendment challenge to Hawaii's ban on campaign contributions by government

contractors to candidates or candidate committees, (HRS § 11-355). The panel held that Hawaii's government contractor contribution ban survived closely drawn scrutiny even as applied to A-1's proposed contributions to candidates who neither decide whether A-1 receives contracts nor oversee A-1's contracts.

The panel held that the individual plaintiffs were entitled to attorney's fees arising from their prior interlocutory appeal challenging HRS § 11-358, which prohibited any person from making contributions to a noncandidate committee in an aggregate amount greater than $1,000 in an election. The panel held that because plaintiffs prevailed in the interlocutory appeal, and subsequently became prevailing parties after the district court entered judgment in their favor, the district court erred by failing to consider whether to award them reasonable appellate attorney's fees. The panel referred the matter to the Ninth Circuit Appellate Commissioner to determine the amount of fees to be awarded.

## COUNSEL

Randy Elf (argued) & James Bopp, Jr., James Madison Center for Free Speech, Terre Haute, Indiana; James Hochberg, Honolulu, Hawaii, for Plaintiff-Appellant.

Justin L. McAdam (argued), Jeffrey P. Gallant & James Bopp, Jr., The Bopp Law Firm, P.C., Terre Haute, Indiana; James Hochberg, Honolulu, Hawaii, for Plaintiffs.

Deirdre Marie-Iha (argued), Deputy Solicitor General, Robyn B. Chun, Deputy Assistant Attorney General & David M.

Louie, Attorney General, Department of the Attorney General, Honolulu, Hawaii, for Defendants-Appellees.

Paul S. Ryan, J. Gerald Hebert, Tara Malloy & Megan McAllen, Washington D.C., for Amicus Curiae The Campaign Legal Center.

## OPINION

FISHER, Circuit Judge:

This appeal concerns the constitutionality of four provisions of Hawaii's campaign finance laws under *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), and related authority. A-1 A-Lectrician, Inc. (A-1), a for-profit corporation, appeals the district court's summary judgment in favor of members of Hawaii's Campaign Spending Commission ("the Commission"). Relying on *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010), we hold that the challenged laws satisfy the First and Fourteenth Amendments.

## I. Background

The plaintiffs are Jimmy Yamada, Russell Stewart and A-1. Before the 2010 general election, Yamada and Stewart each sought to contribute $2,500 to the Aloha Family Alliance–Political Action Committee (AFA-PAC), a registered "noncandidate committee" that makes independent campaign expenditures in Hawaii elections. They were forbidden from doing so, however, by Hawaii Revised Statute (HRS) § 11-358, which prohibits any person from "mak[ing]

contributions to a noncandidate committee in an aggregate amount greater than $1,000 in an election."

Plaintiff A-1 is a Hawaii electrical-construction corporation that makes campaign contributions and engages in political speech. Yamada is its CEO. During the 2010 election, A-1 contributed over $50,000 to candidates, candidate committees and party committees. It also purchased three newspaper advertisements at a cost of $2,000 to $3,000 each. Under the heading "Freedom Under Siege," these advertisements declared that Hawaiians had "lost our freedom" because "we have representatives who do not listen to the people." One advertisement asserted State House Majority Leader Blake Oshiro and other representatives were "intent on the destruction of the family." Another accused Oshiro and his colleagues of "disrespect[ing] the legislative process and the people." In accordance with Hawaii law, *see* HRS § 11-391(a)(2)(B), all three advertisements included a disclaimer that they were "[p]ublished without the approval and authority of the candidate."

As a result of these expenditures and contributions, Hawaii law required A-1 to register as a "noncandidate committee" as defined by HRS § 11-302. Section 11-302 imposes reporting and disclosure requirements on any organization that has "the purpose of making or receiving contributions, making expenditures, or incurring financial obligations to influence [elections]" over $1,000 in the aggregate for an election cycle. *Id*.; *see* HRS § 11-321(g). A-1, which plans to run similar advertisements and to make similar contributions to candidates in the future, objects to both the disclaimer requirement and the noncandidate committee registration and reporting requirements.

If A-1 is relieved of the obligation of registering as a noncandidate committee, it could be subject to reporting requirements associated with "electioneering communications" because it seeks to publish newspaper advertisements that mention candidates by name shortly before an election. *See* HRS § 11-341. Every entity that makes a disbursement for an electioneering communication, such as A-1's newspaper advertisements, must report certain identifying information to the Commission within 24 hours of certain disclosure dates. *See id.* Under the regulations in effect when A-1 filed this action, if A-1 were to remain a noncandidate committee, however, it would not have to file an electioneering communications report or comply with the provisions of HRS § 11-341. *See* Haw. Admin. Rule (HAR) § 3-160-48.[1]

Finally, A-1 is often a state government contractor, and when it has such contracts, Hawaii law prohibits it from making campaign contributions to candidates or candidate committees. *See* HRS § 11-355. A-1 challenges that prohibition as applied to its speech, although it declares it seeks to contribute only to lawmakers who neither award nor oversee its public contracts.

Shortly before the 2010 primary election, Yamada, Stewart and A-1 filed a nine-count complaint challenging the constitutionality of five provisions of Hawaii campaign finance law. Yamada and Stewart challenged the $1,000 limit on contributions to noncandidate committees, HRS § 11-358, and A-1 challenged four other provisions: (1) the

---

[1] On November 5, 2014, an amendment to HRS § 11-341 went into effect, requiring registered noncandidate committees to file electioneering communications statements. *See* 2013 Haw. Sess. L. Act 112.

requirement that it register as a noncandidate committee and the associated expenditure definition, HRS § 11-302; (2) if it does not have to register as a noncandidate committee, the requirement that it report identifying information when it makes an electioneering communication, HRS § 11-341; (3) the requirement that its advertisements include certain disclaimers, HRS § 11-391; and (4) the ban on contributions from government contractors to state legislative candidates, HRS § 11-355.

In October 2010, the district court preliminarily enjoined enforcement of the $1,000 contribution limit, HRS § 11-358, as applied to Yamada's and Stewart's proposed $2,500 contributions to AFA-PAC, a noncandidate committee. *See Yamada v. Kuramoto*, 744 F. Supp. 2d 1075, 1078, 1087 (D. Haw. 2010) (*Yamada I*). The court denied A-1's motion for a preliminary injunction on its first, second and third claims. *See Yamada v. Kuramoto*, No. 10-cv-00497, 2010 WL 4603936, at *20 (D. Haw. Oct. 29, 2010) (*Yamada II*). A-1 did not seek to enjoin the government contractor ban. The defendants appealed the preliminary injunction of § 11-358 but dismissed their appeal before argument.

On the parties' cross-motions for summary judgment, the district court permanently enjoined the $1,000 contribution limit, HRS § 11-358, as applied to Yamada's and Stewart's contributions to AFA-PAC and rejected each of A-1's constitutional challenges. *See Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1027–28, 1063 (D. Haw. 2012) (*Yamada III*). A-1 appeals the denial of summary judgment on its claims. The defendants have not cross-appealed the court's invalidation of § 11-358.

Yamada and Stewart sought their attorney's fees under 41 U.S.C. § 1988 based on their successful constitutional challenge to the $1,000 contribution limit. The district court awarded them $60,152.65 in fees and $3,623.29 in costs. Yamada and Stewart appeal that award in several respects, including the district court's denial of the fees they incurred defending against the defendants' abandoned appeal of the preliminary injunction ruling.

We have jurisdiction under 28 U.S.C. § 1291 and review A-1's constitutional challenges de novo. *See Human Life*, 624 F.3d at 1000. A-1 raises three groups of issues on appeal: (1) whether the expenditure, noncandidate committee and advertisement definitions are unconstitutionally vague; (2) whether the noncandidate committee definition and advertising disclaimer and electioneering communications reporting requirements impose unconstitutional burdens on speech; and (3) whether the ban on contributions by government contractors is unconstitutional as applied to A-1's proposed contributions. Yamada and Stewart also appeal the partial denial of attorney's fees. We address these issues in turn.

## II. Due Process Vagueness Challenge

We begin by addressing A-1's argument that § 11-302's definitions of "expenditure," "noncandidate committee" and "advertisement" are unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). This doctrine "addresses at least

two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). Where, as here, First Amendment freedoms are involved, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* Even for regulations of expressive activity, however, "perfect clarity and precise guidance" are not required, *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), because "we can never expect mathematical certainty from our language," *Human Life*, 624 F.3d at 1019 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)) (internal quotation marks omitted).

In evaluating A-1's challenges, we must consider "any limiting construction that a state court or enforcement agency has proffered." *Ward*, 491 U.S. at 796 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)) (internal quotation marks omitted). We may impose a limiting construction on a statute, however, "only if it is 'readily susceptible' to such a construction." *Reno v. ACLU*, 521 U.S. 844, 884 (1997) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)). We will not "insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance." *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998).

## A.  Hawaii's Expenditure and Noncandidate Committee Definitions Are Not Vague Given the Commission's Narrowing Construction

A-1's first vagueness challenge is to the expenditure and noncandidate committee definitions.  Section 11-302 defines an "expenditure" to include:

> (1) Any purchase or transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, or payment incurred or made, or the use or consumption of a nonmonetary contribution for the purpose of:
>
>> (A) *Influencing* the nomination for election, or the election, of any person seeking nomination for election or election to office, whether or not the person has filed the person's nomination papers;
>>
>> (B) *Influencing* the outcome of any question or issue that has been certified to appear on the ballot at the next applicable election . . . .

HRS § 11-302 (emphasis added).  It defines a "noncandidate committee" as:

> [A]n organization, association, party, or individual that has the purpose of making or receiving contributions, making expenditures, or incurring financial obligations *to influence*

> the nomination for election, or the election, of
> any candidate to office, or for or against any
> question or issue on the ballot . . . .

*Id.* (emphasis added). Noncandidate committees are Hawaii's version of independent expenditure committees, similar to the Washington "political committee" definition we addressed in *Human Life*. *See* 624 F.3d at 997.

A-1 challenges these definitions under *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (per curiam), which held that the terms "influencing" and "for the purpose of influencing" were unconstitutionally vague when used to delineate types of speech subject to regulation. *Id.* at 77–82. If both definitions are unconstitutionally vague, Hawaii cannot constitutionally impose noncandidate committee status and the accompanying registration and reporting burdens on A-1.

Like the district court, we assume without deciding that the term "influence" may be vague under some circumstances. "Conceivably falling within the meaning of 'influence' are objectives as varied as advocacy for or against a candidate's election; championing an issue for inclusion in a candidate's platform; and encouraging all candidates to embrace public funding." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 65 (1st Cir. 2011). But the Commission has offered and the district court applied a limiting construction on the term "influence" in § 11-302's definitions of "expenditure" and "noncandidate committee," eliminating this potential vagueness. Under the Commission's interpretation, "influence" refers only to "communications or activities that constitute express advocacy or its functional equivalent." This interpretation significantly narrows the statutory language, because "express advocacy" requires

words "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject,'" *Buckley*, 424 U.S. at 44 n.52, and communications are the "functional equivalent of express advocacy" only when they are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469–70 (2007) (opinion of Roberts, C.J.).

A-1 argues that the proffered limiting construction does not render § 11-302 constitutional because (1) it is inconsistent with the plain language of the statute, thus barring us from adopting it, and (2) even if we could adopt it, the challenged definitions remain unconstitutionally vague. We find neither argument persuasive.

**1.**

The Commission's proffered construction is not inconsistent with the plain language of the statute. We have previously noted that the term "influencing" is susceptible to a narrowing construction, *see ACLU of Nev. v. Heller*, 378 F.3d 979, 986 n.5 (9th Cir. 2004), and the Commission's interpretation of "influence" is consistent with *Buckley*, which construed the phrase "for the purpose of . . . influencing" to mean "communications that expressly advocate the election or defeat of a clearly identified candidate," 424 U.S. at 79, 80 (footnote omitted). Given the substantial similarity between the statutory language in *Buckley* and the language at issue here, the Commission's gloss is entirely reasonable. *Compare* 2 U.S.C. § 431(f) (1971), *with* HRS § 11-302.

Moreover, the Commission reasonably construes the statute as referring not only to express advocacy but also to

its functional equivalent. After *Buckley*, case law and Federal Election Commission regulations have broadened the concept of express advocacy to include its "functional equivalent," as defined in *Wisconsin Right to Life*, 551 U.S. at 469–70. *See* 11 C.F.R. § 100.22; *Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544, 550–53 (4th Cir. 2012) (discussing the evolution of the "functional equivalent of express advocacy" concept). Elsewhere, Hawaii's Commission has adopted a regulation defining express advocacy with reference to its functional equivalent, or as communications that are "susceptible to no other reasonable interpretation but as an exhortation to vote for or against a candidate." HAR § 3-160-6. The Commission's proposed construction is consistent with *Buckley*, subsequent Supreme Court decisions, federal regulations and other Commission regulations. The proposed construction, therefore, is neither unreasonable nor foreclosed by the plain language of the statute. *See Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 832–34 (7th Cir. 2014) (limiting "for the purpose of influencing the election or nomination for election of any individual to state or local office" to express advocacy and its functional equivalent); *McKee*, 649 F.3d at 66–67 (construing "influencing" and "influence" in Maine campaign finance statutes to include only communications that constitute express advocacy or its functional equivalent).

The legislative history of Hawaii's noncandidate committee and expenditure definitions lends further validity to the Commission's interpretation. In 1979, the Hawaii legislature revised state campaign finance laws to harmonize them with *Buckley*. *See* 1979 Haw. Sess. L. Act 224; Conf. Comm. Rep. No. 78, in Haw. H.J. 1137, 1140 (1979). The legislature was "mindful" that *Buckley* "narrowly construed the operation of the federal spending and contribution

disclosure requirements" to encompass only "communications that expressly advocate the election or defeat of a clearly identified candidate." Conf. Comm. Rep. No. 78, in Haw. H.J. 1137, 1140 (1979). Thus, as the district court concluded, "[i]t is reasonable to infer . . . that Hawaii's Legislature adopted terminology such as 'to influence' in reliance on the Supreme Court's interpretation of the same terminology in federal law." *Yamada III*, 872 F. Supp. 2d at 1046. We agree.[2]

A-1 nonetheless contends we should not adopt the narrowing construction because it would not bind a state court and therefore provides insufficient protection for First Amendment values. We again disagree. By adopting a "'readily apparent' constitutional interpretation," we provide A-1 and other parties not before the court "sufficient protection from unconstitutional application of the statute, as it is quite likely nonparty prosecutors and state courts will apply the same interpretation." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 n.15 (9th Cir. 2013).[3]

---

[2] A-1 draws a different inference from this legislative history, arguing that the legislature's retention of the word "influence" after *Buckley* suggests that the legislature did not intend to limit the law to express advocacy and its functional equivalent. *See Va. Soc'y for Human Life, Inc. v. Caldwell*, 152 F.3d 268, 271 (4th Cir. 1998). We disagree, but even if the legislative history is debatable, the Commission's reasonable limiting interpretation merits our deference. *See Vill. of Hoffman Estates*, 455 U.S. at 504; *McKee*, 649 F.3d at 66.

[3] Like federal courts, Hawaii courts construe state statutes to avoid constitutional infirmities whenever possible. *See, e.g.*, *Kapiolani Park Pres. Soc'y v. City & Cnty. of Honolulu*, 751 P.2d 1022, 1028 (Haw. 1988) ("Legislative acts . . . are not to be held invalid, or unconstitutional,

We hold that the Commission's proffered construction is neither unreasonable nor the product of "strained statutory construction." *Wasden*, 376 F.3d at 932. We therefore adopt it.

**2.**

We also reject A-1's argument that § 11-302's definitions of "expenditure" and "noncandidate committee" are unconstitutionally vague even with this limiting construction in place. With the narrowing gloss, these definitions are sufficiently precise to provide "a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304. Only expenditures for communications that expressly advocate for a candidate or are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate" can trigger noncandidate committee registration, reporting and disclosure requirements under § 11-302. There is no dispute that "express advocacy" is not a vague term, and the controlling opinion in *Wisconsin Right to Life* held the "functional equivalent" or "appeal to vote" component of this test also meets the "imperative for clarity" that due process requires. 551 U.S. at 474 n.7. That close cases may arise in applying this test does not make it unconstitutional, given there will always be an inherent but permissible degree of uncertainty in applying any standards-based test. *See Williams*, 553 U.S. at 306 ("Close cases can be imagined under virtually any statute."); *Real Truth*, 681 F.3d at 554–55. We therefore join the First, Fourth and Tenth Circuits in holding that the "appeal to vote" language

---

or unconscionable, if such a construction can reasonably be avoided."). We would therefore expect Hawaii courts to adopt the same limiting construction.

is not unconstitutionally vague.  *See Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 795–96 (10th Cir. 2013); *Real Truth*, 681 F.3d at 552, 554 ("[T]he test in *Wisconsin Right to Life* is not vague."); *McKee*, 649 F.3d at 70.

A-1 resists this conclusion, advancing two arguments why the "appeal to vote" language is impermissibly vague. Neither is persuasive.

First, A-1 contends the test is unconstitutionally vague because Hawaii's law applies to a broader range of communications than the provision upheld in *Wisconsin Right to Life*.  *Wisconsin Right to Life* sustained the functional equivalent test against a vagueness challenge to the federal definition of electioneering communications, which covers only broadcast communications, *see* 551 U.S. at 474 n.7; 2 U.S.C. § 434(f)(3) (2000 ed., Supp. IV), whereas Hawaii's noncandidate committee and expenditure definitions extend to speech in printed form, *see* HRS § 11-302.  The statute at issue in *Wisconsin Right to Life* also regulated only communications run shortly before an election, whereas Hawaii's statute applies to communications without strict temporal limitations.  But these differences are immaterial. Regardless of when a communication is aired or printed and whether it appears in print or in a broadcast medium, the purveyor of the advertisement has fair notice that the regulations reach only those ads that clearly advocate for an identified candidate.  Like the Fourth Circuit, we hold that the functional equivalent language is not unconstitutionally vague merely because it applies more broadly than the federal provision upheld in *Wisconsin Right to Life*.  *See Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 280–81 (4th Cir. 2013).

Second, the validity of the functional equivalent test has not been undermined by *Citizens United*, which struck down the federal electioneering communication definition, *see* 1 U.S.C. § 434(f)(3), for which the test was first developed. As the First Circuit explained in rejecting an identical argument:

> The basis for *Citizens United*'s holding on the constitutionality of the electioneering expenditure statute had nothing to do with the appeal-to-vote test . . . . Instead, the decision turned on a reconsideration of prior case law holding that a corporation's political speech may be subjected to greater regulation than an individual's. The opinion offered no view on the clarity of the appeal-to-vote test. In fact, the Court itself relied on the appeal-to-vote test in disposing of a threshold argument that the appeal should be resolved on narrower, as-applied grounds.

*McKee*, 649 F.3d at 69 (citations omitted); *see also Nat'l Org. for Marriage v. Roberts*, 753 F. Supp. 2d 1217, 1220 (N.D. Fla. 2010), *aff'd*, 477 Fed. App'x 584, 585 (11th Cir. 2012) (per curiam). We also have relied on the appeal to vote test, albeit in dicta, since *Citizens United*. *See Human Life*, 624 F.3d at 1015. We could not have done so if the test was unconstitutionally vague.

Accordingly, we sustain Hawaii's noncandidate committee and expenditure definitions from A-1's vagueness challenges. The term "influence" is readily and reasonably interpreted to encompass only "communications or activities

that constitute express advocacy or its functional equivalent." As construed, the definitions are not unconstitutionally vague.

## B. Hawaii's Advertising Definition is Not Unconstitutionally Vague

A-1 argues that § 11-302's advertising definition is unconstitutionally vague because it uses the terms "advocates," "supports" and "opposition." This provision spells out when an advertisement must include a disclaimer as to whether the ad was disseminated with or without the approval of a candidate. *See* HRS § 11-391. In relevant part, Hawaii law defines an "advertisement" as:

> any communication, excluding sundry items such as bumper stickers, that:
>
> (1) Identifies a candidate directly or by implication, or identifies an issue or question that will appear on the ballot at the next applicable election; and
>
> (2) *Advocates* or *supports* the nomination, *opposition*, or election of the candidate, or *advocates* the passage or defeat of the issue or question on the ballot.

HRS § 11-302 (emphasis added).

Applying a narrowing construction to this definition, as before, the district court limited the reach of "advocates or supports the nomination, opposition, or election of the candidate" to express advocacy or its functional equivalent. *See Yamada III*, 872 F. Supp. 2d at 1054. With this limiting

construction, the district court concluded that Hawaii's definition of an advertisement was not unconstitutionally vague.  A-1 contends that the district court impermissibly adopted a limiting construction for the same reasons it argues a limiting construction was inappropriate for the noncandidate committee and expenditure definitions.  It further argues that with or without the limiting construction, the challenged definition is unconstitutionally vague under *Buckley* and *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), *overruled on other grounds by Citizens United*, 558 U.S. at 365–66.  The Commission responds that the definition is not vague even without a limiting construction.

We agree with the Commission that Hawaii's advertising definition is sufficiently precise without a limiting construction and therefore decline to adopt one.  The words "advocates or supports" and "opposition" as used here are substantially similar to the words "promote," "oppose," "attack" and "support" that survived a vagueness challenge in *McConnell*.  There, the Court considered a statute defining "Federal election activity" as "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)." 2 U.S.C. § 431(20)(A)(iii).  The Court noted that "[t]he words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision." *McConnell*, 540 U.S. at 170 n.64.  Because "[t]hese words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,'" the

Court held that the provision was not unconstitutionally vague. *Id.* (quoting *Grayned*, 408 U.S. at 108–09).[4] *McConnell* supports the conclusion that Hawaii's advertisement definition is not unconstitutionally vague.

Decisions in other circuits also support that conclusion. In *McKee*, the First Circuit turned away a vagueness challenge to a Maine law using the terms "promoting," "support" and "opposition" in several campaign finance provisions. The terms were not impermissibly vague because they were tied to an "election-related object" – either "candidate," "nomination or election of any candidate" or "campaign." *McKee*, 649 F.3d at 64. Maine's expenditure statute, for example, "instructs that reports submitted pursuant to the provision 'must state whether the expenditure is in *support* of or in *opposition* to the candidate.'" *Id.* at 63 n.41 (quoting Me. Rev. Stat. tit. 21-A, § 1019-B(3)(B)). The Second, Fourth and Seventh Circuits have reached similar conclusions. *See Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128–30 (2d Cir. 2014) (holding that "promotes," "supports," "attacks" and "opposes" were not vague with reference to a "clearly identified candidate"); *Tennant*, 706 F.3d at 286–87 (holding that "promoting or opposing" was not vague); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 485–87, 495 (7th Cir. 2012) (holding that "promote" and "oppose" were not vague).

---

[4] Joining the First, Second and Fourth Circuits, we reject A-1's argument that *McConnell*'s vagueness holding is limited to laws that regulate campaign finance for political parties. *See Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014); *Tennant*, 706 F.3d at 287 ("[T]he Court . . . did not limit its holding to situations involving political parties."); *McKee*, 649 F.3d at 63.

As in *McKee*, Hawaii's statutes are tied to an election-related object – the terms "advocates," "supports" and "opposition" refer only to "the nomination . . . or election of the candidate." HRS § 11-302. So too does the federal law upheld in *McConnell*, which used the words "promote," "oppose," "attack" and "support" only in relation to a "clearly identified candidate for Federal office." 2 U.S.C. § 431(20)(A)(iii). Although the terms "advocate," "support" and "opposition" may not, in isolation, offer sufficient clarity as to what advertisements must include a disclaimer, their proximity to "nomination" or "election of the candidate" make clear the sort of campaign-related advertising for which a disclaimer must be included. Read as a whole and in context, the advertisement definition is sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Finally, we reject A-1's argument that "advocates," a term that *McConnell* did not consider, makes Hawaii's advertising definition unconstitutionally vague. A-1 relies on *Buckley*, which considered a provision that prohibited any person or group from making "any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures . . . advocating the election or defeat of such candidate, exceeds $1,000." 424 U.S. at 42. *Buckley* held that this provision – which imposed a severe restriction on independent spending by all individuals and groups other than political parties and campaign organizations – was impermissibly vague because of its potential breadth, extending to the discussion of public issues untethered from particular candidates. *See id.* at 40, 42. The Court therefore construed the provision "to apply only to expenditures for communications that in express terms

advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 44.

A-1's contention that "advocates" is unconstitutionally vague in this context does not survive the Supreme Court's post-*Buckley* discussion of nearly identical language in *McConnell*, 540 U.S. at 170 n.64. For candidate elections, Hawaii's definition uses the word "advocates" only in relation to a communication that (1) identifies a candidate and (2) "advocates or supports the nomination, opposition, or election of [that] candidate." HRS § 11-302. Although the word "advocates" was not at issue in *McConnell*, there is nothing unconstitutionally vague about "advocate" when used in Hawaii's advertising definition to refer to communications that identify a candidate for state office and "plead in favor of" that candidate's election. Webster's Third New International Dictionary 32 (2002). A-1's vagueness challenge to the Hawaii advertising definition therefore fails.

## III. First Amendment Claims

A-1 brings First Amendment challenges to (1) the registration, reporting and disclosure requirements that Hawaii places on "noncandidate committees" and (2) the requirement that political advertisements include a disclaimer stating whether they are broadcast or published with the approval of a candidate. Because the challenged laws provide for the disclosure and reporting of political spending but do not limit or ban contributions or expenditures, we apply exacting scrutiny. *See Family PAC v. McKenna*, 685 F.3d 800, 805–06 (9th Cir. 2011); *Human Life*, 624 F.3d at 1005. To survive this scrutiny, a law must bear a substantial relationship to a sufficiently important governmental interest. *See Doe v. Reed*, 561 U.S. 186, 196 (2010); *Human Life*,

624 F.3d at 1008. Put differently, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe*, 561 U.S. at 196 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008)) (internal quotation marks omitted).

## A. The Noncandidate Committee Reporting and Disclosure Requirements Survive Exacting Scrutiny As Applied to A-1

We first consider whether the noncandidate committee reporting and disclosure requirements satisfy exacting scrutiny as applied to A-1. Looking to the burden side of the balance, the district court found that the "registration and disclosure requirements that come with noncandidate committee status do not present an undue burden on A-1." *Yamada III*, 872 F. Supp. 2d at 1052. We agree.

The noncandidate committee is Hawaii's method for monitoring and regulating independent political spending in state elections. In relevant part, a noncandidate committee is broadly defined as an organization "that has the purpose of making or receiving contributions, making expenditures, or incurring financial obligations to influence" Hawaii elections. HRS § 11-302.[5] To paraphrase the statute, and incorporating the Commission's narrowing construction we adopted earlier (see page 20), the noncandidate committee definition is limited to an organization that:

---

[5] Although noncandidate committee status also extends to an individual who makes contributions or expenditures not of his or her own funds, *see* HRS § 11-302, the parties focus solely on noncandidate committee status for organizations, and we shall do the same.

> Has "the purpose" of making or receiving contributions, or making expenditures, for communications or activities that constitute express advocacy or its functional equivalent (i.e., that are susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate to office, or for or against any question or issue on the ballot).

Expenditures are further defined as payments or nonmonetary contributions made for the purpose of communications or activities that constitute express advocacy or its functional equivalent. *See id.*; HRS § 11-302.

Noncandidate committee status is triggered only when an organization receives contributions or makes or incurs qualifying expenditures totaling more than $1,000 during a two-year election cycle. *See* HRS § 11-321(g). Within 10 days of reaching this threshold, the organization must register as a noncandidate committee by filing an organizational report with the Commission. *Id.* In addition to registering, the organization must file an organizational report, designate officers, disclose its bank account information, and designate a treasurer responsible for recording contributions and expenditures and maintaining records for five years. *See* HRS §§ 11-321, 11-323, 11-324, 11-351(a). The committee's contributions must be segregated from its other funds. *See* HAR § 3-160-21(c).

Every committee must also comply with reporting requirements tied to election periods. These requirements include disclosing contributions made and received, expenditures by the committee and the assets on hand at the

end of the reporting period. *See* HRS §§ 11-331 (filing of reports), 11-335 (noncandidate committee reports), 11-336 (timing of reports for noncandidate committees), 11-340 (penalties for failure to file a required report).[6] The reports must be filed no later than 10 days before an election, 20 days after a primary election and 30 days after a general election; additional reports must be filed on January 31 of every year and July 31 after an election year. *See* HRS § 11-336(a)–(d). If a noncandidate committee has aggregate contributions and expenditures of $1,000 or less in an election period, it need only file a single, final election-period report, or it may simply request to terminate its registration. *See* HRS §§ 11-326, 11-339(a).

A-1's argument that these burdens are substantial is foreclosed by *Human Life*, which held that the burdens of compliance with Washington State's materially indistinguishable registration and reporting requirements were "modest" and "not unduly onerous." 624 F.3d at 1013–14. Indeed, the majority of circuits have concluded that such disclosure requirements are not unduly burdensome. *See Sorrell*, 758 F.3d at 137–38 (rejecting the argument that "registration, recordkeeping necessary for reporting, and reporting requirements" are onerous as a matter of law); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1250 (11th Cir. 2013) (holding that Florida's analogous "PAC regulations do not generally impose an undue burden"); *McKee*, 649 F.3d at

---

[6] The Hawaii Legislature slightly revised the reporting requirements after the district court granted summary judgment to the Commission. *See* 2013 Haw. Sess. Laws 209-10 (S.B. 31) (amending HRS §§ 11-335, 11-336). We consider the version of the reporting statutes in effect at the time this suit was filed. In any event, the minor amendments do not affect our constitutional analysis.

56 (holding that Maine's analogous PAC regulations "do not prohibit, limit, or impose any onerous burdens on speech"); *Family PAC*, 685 F.3d at 808 n.6 (noting the generally "modest" administrative burdens imposed on ballot committees by Washington law); *Speechnow.org v. Fed. Election Comm'n*, 599 F.3d 686, 697–98 (D.C. Cir. 2010) (holding that the organizational, administrative and continuous reporting requirements applicable to federal political committees were not unduly burdensome); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 789–92 (9th Cir. 2006) (holding that registration, reporting and disclosure requirements applicable to Alaskan political committees were not "significantly burdensome" or "particularly onerous").

A-1 would distinguish *Human Life*'s burden analysis on the ground that a noncandidate committee in Hawaii is subject to additional limits on the kinds of contributions it may receive. Specifically, A-1 points to Hawaii law limiting contributions to noncandidate committees (HRS § 11-358), and banning contributions from particular sources, including bans on contributions made in the name of another (HRS § 11-352), anonymous contributions (HRS § 11-353), or prohibitions on contributions from government contractors and foreign nationals (HRS §§ 11-355, 11-356). These differences do not distinguish *Human Life*. First, because A-1 is self-financed and does not receive contributions, any funding limits or bans have no bearing on our as-applied constitutional analysis. Second, none of these limits imposes a substantial burden. The Commission concedes that the only constitutionally suspect limit A-1 identifies – the $1,000 limit on contributions to noncandidate committees – is unconstitutional as applied to committees making only independent expenditures. The other limits apply to A-1 regardless of its status as a noncandidate committee. Thus,

there are no material differences between the burdens of noncandidate committee status in Hawaii and political committee status in Washington.[7]

A-1 has been complying with the noncandidate committee requirements for several years without difficulty. No separate organization need be created, as long as records are kept tracking financial activity by the noncandidate committee, *see* HAR § 3-160-21(c), and filing of the brief, required reports may be performed electronically at infrequent intervals, *see* HRS § 11-336. As the district court concluded, "[a]lthough the requirements might be inconvenient, the record does not indicate the burdens on A-1 are onerous as matters of fact or law." *Yamada III*, 872 F. Supp. 2d at 1053.

---

[7] The burdens of noncandidate committee status in Hawaii are also distinguishable from the burdens of federal "PAC status" that A-1 labels "onerous," citing to the Supreme Court's decisions in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 248 (1986), and *Citizens United*, 558 U.S. at 337–39. The federal PAC status in *MCFL* required corporations to set up a separate legal entity and create a segregated fund before engaging in any direct political speech, and further prohibited an organization from soliciting contributions beyond its "members." *See McKee*, 649 F.3d at 56; *see also Madigan*, 697 F.3d at 488 (distinguishing *MCFL*'s PAC burdens); *Human Life*, 624 F.3d at 1010 (same); *Alaska Right to Life*, 441 F.3d at 786–87, 791–92 (same). *But see Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 839–42 (7th Cir. 2014) (describing the "heavy administrative burdens" of Wisconsin's analogous, but more detailed, "PAC-like disclosure program," which "in critical respects [was] unchanged from *Buckley*'s day"). Like Maine's political committee provision, Hawaii law "imposes three simple obligations" on a qualifying entity that are not nearly as onerous as those considered in *MCFL*: "filing of a registration form disclosing basic information, . . . reporting of election-related contributions and expenditures, and simple recordkeeping." *McKee*, 649 F.3d at 56.

Turning to the governmental interests side of the equation, there is no question that Hawaii's noncandidate committee requirements serve important government interests. The Hawaii legislature created these requirements to "expand the scope of public scrutiny relative to the financial aspects of the campaign process" and to avoid corruption or its appearance in electoral politics. House Stand. Comm. Rep. No. 188, H.B. No. 22, in Haw. H.J. 840 (1973). Subsequent amendments to Hawaii's disclosure scheme reaffirmed the important "informational value" served by reporting and disclosure requirements, as well as the state's interest in"deterr[ing] . . . corruption" and "gathering data necessary to detect violations" of campaign finance laws. Conf. Comm. Rep. No. 78, in Haw. H.J. 1137, 1140 (1979). When Hawaii revised its campaign finance laws in 1995, the legislature cited the importance of "reforming the campaign spending law . . . to restor[e] the public's confidence in the political process." S. Stand. Comm. Rep. No. 1344, H.B. No. 2094, Haw. S.J. 1346 (1995). The legislature found that "[m]aking candidates, contributors, and others more accountable by requiring the filing of reports . . . and specifying what information must appear in these reports go[es] a long way to accomplishing these goals." *Id.*

Thus, Hawaii's noncandidate committee regulations serve all three interests that the Supreme Court has recognized as "important" in the context of reporting and disclosure requirements: "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d

1021, 1031 (9th Cir. 2009) (quoting *McConnell*, 540 U.S. at 196).

First, the reporting and disclosure obligations provide information to the electorate about who is speaking – information that "is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment." *Human Life*, 624 F.3d at 1005; *see also McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1459–60 (2014); *Citizens United*, 558 U.S. at 368–69; *Family PAC*, 685 F.3d at 806, 808. "This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages," *Citizens United*, 558 U.S. at 371, making disclosure of this information a "sufficiently important, if not compelling, governmental interest," *Human Life*, 624 F.3d at 1005–06.    Second, Hawaii's reporting and disclosure obligations "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley*, 424 U.S. at 67; *see also McCutcheon*, 134 S. Ct. at 1459.   Third, the registration, record keeping, reporting and disclosure requirements provide a means of detecting violations of valid contribution limitations, preventing circumvention of Hawaii's campaign spending limitations, including rules that bar contributions by foreign corporations or individuals, *see* HRS § 11-356, or that prohibit contributions from government contractors, *see* HRS § 11-355. *See Buckley*, 424 U.S. at 67–68; *Speechnow.org*, 599 F.3d at 698 (holding that "requiring disclosure . . . deters and helps expose violations of other campaign finance restrictions").   Thus, Hawaii's noncandidate committee reporting and disclosure requirements indisputably serve important governmental interests.

A-1 nonetheless contends these reporting and disclosure requirements are not sufficiently tailored to survive exacting scrutiny because they apply to any organization that has "the purpose" of engaging in political advocacy, HRS § 11-302, rather than applying more narrowly to organizations having a *primary* purpose of engaging in such activity.  A-1 concedes that Hawaii may impose reporting and disclosure requirements on organizations that make political advocacy a priority but argues that it only incidentally engages in such advocacy.

A-1's argument rests on *Human Life*, which considered the Washington disclosure regime whereby an organization qualifies as a political committee if its "primary or one of [its] primary purposes is to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions."  624 F.3d at 1008 (internal quotation marks and citation omitted).  First, *Human Life* rejected the argument that this definition was facially overbroad because "it covers groups with '*a*' primary purpose of political advocacy, instead of being limited to groups with '*the*' primary purpose of political advocacy."  624 F.3d at 1008–11 (emphasis added).  It explained that *Buckley* and *Federal Election Commission v. Massachusetts Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238 (1986), did not hold that an entity must have the sole, major purpose of political advocacy "to be deemed constitutionally a political committee." *Human Life*, 624 F.3d at 1009–10 (citing *Buckley*, 424 U.S. at 79).  Next, *Human Life* held that Washington's political committee definition withstood exacting scrutiny because there was "a substantial relationship between Washington State's informational interest and its decision to impose disclosure requirements on organizations with a primary

purpose of political advocacy." *Id.* at 1011. We reasoned that the definition:

> does not extend to all groups with "a purpose" of political advocacy, but instead is tailored to reach only those groups with a "primary" purpose of political activity. This limitation ensures that the electorate has information about groups that make political advocacy *a priority*, without sweeping into its purview groups that only *incidentally* engage in such advocacy. Under *this* statutory scheme, the word "primary" – not the words "a" or "the" – is what is constitutionally significant.

*Id.* at 1011 (emphasis added).

A-1 correctly points out that the provision at issue in *Human Life* applied to organizations with a primary purpose of political advocacy, whereas Hawaii's law applies to an organization with "the purpose" of political advocacy. *Human Life*, however, did not "hold that the word 'primary' or its equivalent [was] constitutionally necessary." *Id.* It held only that this limitation was "sufficient" for Washington's political committee definition to withstand First Amendment scrutiny. *Id.* *Human Life* is therefore not controlling, and, reaching an issue we did not address there, we conclude that Hawaii's noncandidate committee reporting and disclosure requirements are sufficiently tailored as applied to A-1 even without a "primary" modifier.

First, because Hawaii's definition extends only to organizations having "the purpose" of political advocacy, it avoids reaching organizations engaged in only incidental

advocacy. Under the Commission's narrowing construction, noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making expenditures, for express advocacy or its functional equivalent. *Cf. Madigan*, 697 F.3d at 488 (holding that Illinois' political committee definition's "limit of 'on behalf of or in opposition to' confines the realm of regulated activity to expenditures and contributions within the core area of genuinely campaign-related transactions").[8]

Second, Hawaii's registration and reporting requirements are not triggered until an organization makes more than $1,000 in aggregate contributions and expenditures during a two-year election period. *See* HRS § 11-321(g); HAR § 3-160-21(a). This threshold also ensures that an organization must be more than incidentally engaged in political advocacy before it will be required to register and file reports as a noncandidate committee. Third, an organization that "raises or expends funds for the sole purpose of producing and disseminating informational or educational communications" – even if it also engages in limited political advocacy costing less than $1,000 in the aggregate – need not register as a noncandidate committee. *See* HRS §§ 11-302; 11-321(g).

---

[8] Hawaii's definition is distinguishable from the Wisconsin regulation struck down in *Barland*, 751 F.3d at 822, 834–37, which treated an organization as a political committee if it, inter alia, spent more than $300 to communicate "almost anything . . . about a candidate within 30 days of a primary and 60 days of a general election." Hawaii's more tailored disclosure regime only extends to organizations with the purpose of engaging in express advocacy or its functional equivalent. *See Sorrell*, 758 F.3d at 137–38 (distinguishing *Barland* and upholding Vermont's political committee regime, which applied only to groups that accepted contributions and made expenditures over $1,000 "for the purpose of supporting or opposing one or more candidates").

Fourth, if an organization registers as a noncandidate committee, but subsequently reduces its advocacy activity below the $1,000 threshold, it need only file a single report per election period or can terminate its registration. HRS § 11-339.[9]

Given these limits and the extent of A-1's past and planned political advocacy, we have little trouble concluding that the regulations are constitutional as applied to A-1. A-1, which made more than $50,000 in contributions and spent more than $6,000 on political ads in 2010, clearly engages in more than incidental political advocacy. Although A-1 now pledges to limit its individual contributions to $250 and to contribute only to candidates, these proposed activities – combined with A-1's expenditures on its political ads –

[9] The reporting requirements of Hawaii law are more narrowly tailored than the "onerous" and "potentially perpetual" reporting requirement preliminary enjoined in *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873–74 (8th Cir. 2012) (en banc). In Minnesota, an organization must register as a political committee once it spends $100 in the aggregate on political advocacy, and once registered, it must "file five reports during a general election year" even if the committee makes no further expenditures. *Id.* at 873, 876; *see also Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 596–98 (8th Cir. 2013) (striking down Iowa's ongoing reporting requirements that were untethered to any future political spending). We do not agree that such reporting requirements are "onerous" as a general matter. *See Human Life*, 624 F.3d at 1013–14. Moreover, unlike in Minnesota, an organization need not register as a noncandidate committee in Hawaii until it crosses the $1,000 threshold for a two-year election cycle, *see* HRS § 11-321(g), and a committee with aggregate contributions and expenditures of $1,000 or less in any subsequent election cycle need only file a single, final election-period report, *see* HRS § 11-326. Hawaii's reporting regime is thus contingent on an organization's ongoing contributions and expenditures, reflecting its closer tailoring to Hawaii's informational interest than Minnesota's analogous regime.

plainly exceed incidental activity. Hawaii thus has a strong interest in regulating A-1.

Hawaii's choice of a $1,000 registration and reporting threshold is also a far cry from the zero dollar threshold invalidated in *Canyon Ferry*, 556 F.3d at 1033–34. *See also Worley*, 717 F.3d at 1251 (noting that "federal PAC requirements kick in once a group has raised $1000 during a calendar year to influence elections and . . . these requirements have not been held unconstitutional" (citing 1 U.S.C. § 431(4)(a) (2012))). Although we carefully scrutinize the constitutionality of a legislature's chosen threshold for imposing registration and reporting requirements, *see Randall v. Sorrell*, 548 U.S. 230, 248–49 (2006) (plurality opinion), the precise "line is necessarily a judgmental decision, best left in the context of this complex legislation to [legislative] discretion," *Family PAC*, 685 F.3d at 811 (quoting *Buckley*, 424 U.S. at 83); *see also Worley*, 717 F.3d at 1253 ("Challengers are free to petition the legislature to reset the reporting requirements for Florida's PAC regulations, but we decline to do so here."). At least as applied to A-1, Hawaii's $1,000 threshold adequately ensures that political committee burdens are not imposed on "groups that only incidentally engage" in political advocacy. *Human Life*, 624 F.3d at 1011.

A-1's argument that regulations should reach only organizations with a primary purpose of political advocacy also ignores the "fundamental organizational reality that most organizations do not have just one major purpose." *Human Life*, 624 F.3d at 1011 (internal quotation marks and citation omitted). Large organizations that spend only one percent of their funds on political advocacy likely have many other, more important purposes – but this small percentage could

amount to tens or hundreds of thousands of dollars in political activity, depending on the size of the organization. *See id.*; *see also Madigan*, 697 F.3d at 489–90; *McKee*, 649 F.3d at 59. The $1,000 threshold appropriately reaches these multipurpose organizations' participation in the political process.

A-1's political advocacy underscores this point. Although A-1's political spending may be limited in proportion to its overall activities, the strength of Hawaii's informational interest does not fluctuate based on the diversity of the speaker's activities. Hawaii has an interest in ensuring the public can follow the money in an election cycle, regardless of whether it comes from a single-issue, political advocacy organization or a for-profit corporation such as A-1. The Commission makes the reported information freely available in searchable databases on its website, which provides Hawaiians with a vital window into the flow of campaign dollars.[10] This prompt, electronic disclosure of contributions and expenditures "can provide . . . citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters," *Citizens United*, 558 U.S. at 370, and "given the Internet, disclosure offers much more robust protections against corruption," *McCutcheon*, 134 S. Ct. at 1460. Thus, the distinction between A-1, a for-profit electrical contractor, and a group like Human Life of Washington, a "nonprofit, pro-life advocacy corporation," 624 F.3d at 994, is not constitutionally significant here. A-1 may not make political advocacy a priority, but it nonetheless has been a significant participant in Hawaii's electoral process, justifying the state's imposition of registration and reporting burdens.

---

[10] *See* http://ags.hawaii.gov/campaign/nc/.

Furthermore, Hawaii's noncandidate committee definition, by extending beyond organizations making political advocacy a priority, avoids the circumvention of valid campaign finance laws and disclosure requirements. *See Human Life*, 624 F.3d at 1011–12. As the Seventh Circuit has explained:

> [L]imiting disclosure requirements to groups with the major purpose of influencing elections would allow even those very groups to circumvent the law with ease. Any organization dedicated primarily to electing candidates or promoting ballot measures could easily dilute that major purpose by just increasing its non-electioneering activities or better yet by merging with a sympathetic organization that engaged in activities unrelated to campaigning.

*Madigan*, 697 F.3d at 489. Hawaii's definition addresses the "hard lesson of circumvention" in the campaign finance arena, by including within its reach any entity that has political advocacy as *one* of its goals. *McConnell*, 540 U.S. at 165. As the district court explained:

> [A-1] has purposely not created a separate organizational structure for election-related activity, choosing instead to register itself (A-1 A-Lectrician, Inc.) as a noncandidate committee. If it were allowed to avoid registration merely because its political activity is small proportionally to its overall activities (as an electrical contractor and perhaps as a pure issue advocacy

organization), it would encourage any affiliated noncandidate committee to avoid disclosure requirements by merging its activities into a larger affiliated organization.

*Yamada III*, 872 F. Supp. 2d at 1052 (citation omitted).[11]

In sum, the noncandidate committee definition and accompanying reporting and disclosure requirements are substantially related to Hawaii's important interests in informing the electorate, preventing corruption or its appearance, and avoiding the circumvention of valid campaign finance laws. Because the burden of complying with this disclosure scheme is modest compared to the significance of the interests being served, we uphold Hawaii's noncandidate committee reporting and disclosure requirements as applied to A-1.

In doing so on an as-applied basis, we have no occasion to consider whether Hawaii law would withstand exacting scrutiny as applied to another business or nonprofit group that seeks to engage in less substantial political advocacy than A-1. We decline to "speculate about 'hypothetical' or

---

[11] Although not directly relevant to A-1's challenge – because A-1's political activities are self-financed and it receives no contributions – we also note the heightened importance of noncandidate committee disclosure requirements now that the limit on contributions to noncandidate committees has been permanently enjoined. A single contributor may provide thousands of dollars to independent committees, and yet avoid disclosing its identity if the committee makes all the expenditures itself. The noncandidate committee definition acts to ensure that the contributor's identity will be disclosed to the voting public. Hawaii's efforts to provide transparency would be incomplete if disclosure was not required in such circumstances.

'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Based on the record before us, we hold only that noncandidate committee status may be extended to organizations, such as A-1, even though their primary purpose is not political advocacy. The burdens attending such a status are modest and substantially related to important government interests.

## B.  The Disclaimer Requirement for Advertisements is Constitutional Under *Citizens United*

A-1 contends that Hawaii's requirement that political advertising include a disclaimer as to the affiliation of the advertiser with a candidate or candidate committee cannot survive exacting scrutiny. "Advertisements" for purposes of Hawaii election law are print and broadcast communications that (1) identify a candidate or ballot issue directly or by implication and (2) "advocate[] or support[] the nomination, opposition, or election of the candidate, or advocate[] the passage or defeat of the issue or question on the ballot." HRS § 11-302. The challenged disclaimer rule provides that an advertisement must include a "notice in a prominent location" that "[t]he advertisement has the approval and authority of the candidate" or "has not been approved by the candidate." HRS § 11-391(a)(2).[12, 13]   The rule thus advises voters whether an advertisement is coordinated with or independent

---

[12] A-1 does not challenge the related requirement that all political advertisements disclose the name and address of the person or entity paying for the ad.  *See* HRS § 11-391(a)(1).

[13] This provision was amended during the pendency of this appeal, but the minor changes are immaterial.  *See* 2014 Hawaii Laws Act 128 (H.B. 452).

from a candidate for elected office. The fine for violating this section is $25 per advertisement, not to exceed $5,000 in the aggregate. *See* HRS § 11-391(b).

A-1 seeks to place advertisements that (1) mention a candidate by name; (2) run in close proximity to an election; and (3) include language stating that particular candidates "are representatives who do not listen to the people," "do not understand the importance of the values that made our nation great" or "do not show the aloha spirit." It argues the disclaimer requirement is unconstitutional because it regulates the content of speech itself and is therefore an even greater incursion on its First Amendment rights than reporting requirements. A-1 further contends a disclaimer can be mandated only for speech that is a federal electioneering communication, as defined by federal law, or that is express advocacy, not including its functional equivalent.

We agree with the district court that the disclaimer requirement survives exacting scrutiny as applied to A-1's newspaper advertisements. Like the noncandidate committee requirements, the disclaimer serves an important governmental interest by informing the public about who is speaking in favor or against a candidate before the election and imposes only a modest burden on First Amendment rights. A-1's arguments to the contrary are all but foreclosed by *Citizens United*, 558 U.S. at 366–69.

First, the disclaimer requirement imposes only a modest burden on A-1's First Amendment rights. Like disclosure requirements, "[d]isclaimer . . . requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking."

*Id.* at 366 (citation and internal quotation marks omitted). Hawaii's disclaimer requirement is no more burdensome than the one for televised electioneering communications upheld in *Citizens United*. *See id.* at 366–69. That rule required a statement as to who was responsible for the content of the advertisement "be made in a 'clearly spoken manner,' and displayed on the screen in a 'clearly readable manner' for at least four seconds," along with a further statement that "the communication 'is not authorized by any candidate or candidate's committee.'" *Id.* at 366 (quoting 2 U.S.C. § 441d(d)(2), (a)(3)). Similarly, all that is required here is a short statement stating that the advertisement is published, broadcast, televised, or circulated with or without the approval and authority of the candidate. *See* HRS § 11-391(a).

Second, requiring a disclaimer is closely related to Hawaii's important governmental interest in "dissemination of information regarding the financing of political messages." *McKee*, 649 F.3d at 61. A-1's past advertisements ran shortly before an election and criticized candidates by name as persons who did not, for example, "listen to the people." As the district court found, these advertisements – published on or shortly before election day – are not susceptible to any reasonable interpretation other than as an appeal to vote against a candidate. *Yamada III*, 872 F. Supp. 2d at 1055. Such ads are the very kind for which "the public has an interest in knowing who is speaking," *Citizens United*, 558 U.S. at 369, and where disclaimers can "avoid confusion by making clear that the ads are not funded by a candidate or political party," *id.* at 368. *See also Worley*, 717 F.3d at 1253–55 (rejecting a challenge to an analogous disclaimer requirement); *McKee*, 649 F.3d at 61 (same); *Alaska Right to Life*, 441 F.3d at 792–93 (same). And contrary to A-1's

argument, nothing in *Citizens United* suggests that a state may not require disclaimers for political advertising that is not the functional equivalent of a federal electioneering communication.   In applying the federal disclaimer requirement to an advertisement urging voters to see a short film about a presidential candidate, *Citizens United* explained that "[e]ven if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election." 558 U.S. at 369.[14]

Accordingly, the disclaimer requirement does not violate the First Amendment as applied to A-1's political advertisements.

---

[14] We reject A-1's comparison to the disclaimer invalidated by the Supreme Court in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 340 (1995), which prohibited the distribution of pamphlets without the name and address of the person responsible for the materials, or to the disclosure provision invalidated by this court in *ACLU of Nev. v. Heller*, 378 F.3d 979, 981–82 (9th Cir. 2004), which required persons paying for publication of any material "relating to an election" to include their names and addresses.  *Citizens United*'s post-*McIntyre*, post-*Heller* discussion makes clear that disclaimer laws such as Hawaii's may be imposed on political advertisements that discuss a candidate shortly before an election. *See* 558 U.S. at 368–69; *see also Worley*, 717 F.3d at 1254 (rejecting the argument that *McIntyre* dictated the demise of Florida's analogous disclaimer requirement).  An individual pamphleteer may have an interest in maintaining anonymity, but "[l]eaving aside *McIntyre*-type communications . . . there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way." *Alaska Right to Life*, 441 F.3d at 793.

## C.  A-1 Lacks Standing to Challenge the Electioneering Communications Reporting Requirements

A-1 acknowledges that, at the time it filed this action, it lacked standing to challenge the electioneering communications law if it must continue to register as a noncandidate committee.  *See Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) ("A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). A-1 argues, however, that it now has standing because Hawaii law was amended as of November 5, 2014, to require registered noncandidate committees to comply with electioneering communications reporting requirements.  *See* 2013 Haw. Sess. L. Act 112.  But, "[s]tanding is determined as of the commencement of litigation."  *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002); *see also Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint. . . .  The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing." (alteration in original) (internal quotation marks omitted)), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed. It cannot be that, by later participating in the suit, the State Department and AID retroactively created a redressability (and hence a jurisdiction) that did not exist at the outset." (citation and internal quotation marks omitted)). Accordingly, because we conclude the noncandidate

committee requirements can be constitutionally applied to A-1, and A-1 was not subject to the "electioneering communication" reporting requirements as of the date the complaint was filed, we do not consider A-1's constitutional challenge to those requirements. *See* HRS § 11-341.[15]

## D. The Contractor Contribution Ban is Constitutional Even As Applied to Contributions to Legislators Who Neither Award nor Oversee Contracts

A-1's final First Amendment challenge is to Hawaii's ban on contributions by government contractors. The challenged provision makes it

> unlawful for any person who enters into any contract with the State, any of the counties, or any department or agency thereof either for the rendition of personal services, the buying of property, or furnishing of any material, supplies, or equipment to the State, any of the counties, any department or agency thereof, or for selling any land or building to the State, any of the counties, or any department or agency thereof, if payment for the performance of the contract or payment for material, supplies, equipment, land, property, or building is to be made in whole or in part from funds appropriated by the legislative body, at any time between the execution of

---

[15] Nothing we say today (other than as a matter of stare decisis) precludes A-1 from bringing a future challenge to the electioneering communication reporting requirements to which, it claims, it is now subject.

the contract through the completion of the contract, to:

. . . Directly or indirectly make any contribution, or promise expressly or impliedly to make any contribution to any candidate committee or noncandidate committee, or to any candidate or to any person for any political purpose or use;

HRS § 11-355(a).

A-1 does not challenge the ban as applied to contributions it makes to lawmakers or legislative candidates who either decide whether it will receive a contract or oversee its performance of a contract. Instead, A-1 asserts it intends to make contributions only to lawmakers or candidates who will neither award nor oversee its contracts, and it argues the government contractor contribution ban is unconstitutional solely as applied to those intended contributions.[16]

Contribution bans are subject to "closely drawn" scrutiny. *See Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161–63 (2003) (applying the closely drawn standard in upholding a federal law banning campaign contributions made by corporations); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1124 & n.4 (9th Cir. 2011) (applying closely

---

[16] A-1 challenges only its right to make contributions to state legislative candidates while acting as a state government contractor. It does not distinctly argue, for example, that § 11-355(a) impermissibly infringes its right to contribute to county or municipal officials while serving as a state contractor. We therefore have no occasion to decide whether the ban would survive First Amendment scrutiny as applied to those circumstances.

drawn scrutiny to a city ordinance making it unlawful for "non-individuals" to contribute directly to candidates). A regulation satisfies closely drawn scrutiny when "the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 25) (internal quotation marks omitted).**[17]**

A-1 does not argue that Hawaii's government contractor contribution ban is unconstitutional as a general matter. The Second Circuit confronted a similar ban in *Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010). There, the court turned away a First Amendment challenge to Connecticut's ban on campaign contributions by state contractors, holding that it furthered a "'sufficiently important' government interest[]" by "combat[ing] both actual corruption and the appearance of corruption caused by contractor contributions." *Id.* at 200. The court further held that the ban was "closely drawn" because it targeted contributions by current and prospective state contractors – the contributions associated most strongly with actual and perceived corruption. *See id.* at 202. Recognizing a *ban* on

---

**[17]** We previously noted that *Beaumont* and other cases applying the closely drawn standard to contribution limits remained good law after *Citizens United*. *See Thalheimer*, 645 F.3d at 1124–25. This remains true after *McCutcheon*. There, the Supreme Court considered the constitutionality of "aggregate limits" under federal law, which "restrict[ed] how much money a donor [could] contribute in total to all candidates or committees" in a given election period. *See* 134 S. Ct. at 1442 (citing 2 U.S.C. § 441a(a)(3)). Because the Court held that the aggregate limit for federal elections failed even under less stringent, "closely drawn" scrutiny, the Court declined to revisit the proper standard of review for contribution limits. *See id.* at 1445–46.

contributions by government contractors, rather than a mere *limit* on the amount of those contributions, was "a drastic measure," the court held that the ban was closely drawn because it addressed a perception of corruption brought about by recent government-contractor-related corruption scandals in Connecticut. *See id.* at 193–94, 204–05. The ban "unequivocally addresses the perception of corruption" because, "[b]y totally shutting off the flow of money from contractors to state officials, it eliminates any notion that contractors can influence state officials by donating to their campaigns." *Id.* at 205; *see also Ognibene v. Parkes*, 671 F.3d 174, 185 (2d Cir. 2011) ("When the appearance of corruption is particularly strong due to recent scandals . . . a ban may be appropriate.").

The same reasoning applies here. Hawaii's government contractor contribution ban serves sufficiently important governmental interests by combating both actual and the appearance of quid pro quo corruption. *Green Party*, 616 F.3d at 200; *see also McCutcheon*, 134 S. Ct. at 1450 (reaffirming that a legislature may limit contributions to prevent actual quid pro quo corruption or its appearance); *cf. Preston v. Leake*, 660 F.3d 726, 736–37 (4th Cir. 2011) (upholding a complete ban on contributions by lobbyists "as a prophylactic to prevent not only actual corruption but also the appearance of corruption in future state political campaigns"). It is closely drawn because it targets direct contributions from contractors to officeholders and candidates, the contributions most closely linked to actual and perceived quid pro quo corruption. *See Green Party*, 616 F.3d at 202; *see also McCutcheon*, 134 S. Ct. at 1452 (noting that the "risk of *quid pro quo* corruption or its appearance" is greatest when "a donor contributes to a

candidate directly").[18]    And as in Connecticut, Hawaii's decision to adopt an outright ban rather than mere restrictions on how much contractors could contribute was justified in light of past "pay to play" scandals and the widespread appearance of corruption that existed at the time of the legislature's actions.  *See Yamada III*, 872 F. Supp. 2d at 1058–59 nn. 26–27 (summarizing the evidence of past scandals and the perception of corruption).  Thus, as a general matter, Hawaii's ban on contributions by government contractors satisfies closely drawn scrutiny.

A-1's narrower argument that the contractor contribution ban is unconstitutional as applied to its contributions to lawmakers and candidates *who neither award nor oversee its contracts* is also without merit.   Hawaii's interest in preventing actual or the appearance of quid pro quo corruption is no less potent as applied to A-1's proposed contributions because the Hawaii legislature *as a whole* considers all bills concerning procurement.  Thus, although an individual legislator may not be closely involved in awarding or overseeing a particular contract, state money can

---

[18] Hawaii's contractor contribution ban is narrower than many others. The ban upheld in *Green Party*, for example, applied not only to contractors but also to principals of that contractor and to family members of a contractor or of a principal of a contractor.  *See Green Party*, 616 F.3d at 202–03.  The federal ban is also broader than the Hawaii ban; it applies not only to existing contractors but also to prospective contractors.  *See* 2 U.S.C. § 441c.  Hawaii's law does not prohibit A-1 from making contributions as a prospective contractor, A-1's principals (such as plaintiff Yamada) from making contributions or A-1 from making independent expenditures on behalf of the candidates it seeks to support. *Cf. Beaumont*, 539 U.S. at 161 n.8 ("A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information.").

be spent only with an appropriation by the entire legislature. *See* Haw. Const. art. VII, §§ 5, 9. Hawaii reasonably concluded that contributions to any legislator could give rise to the appearance of corruption.

In essence, A-1 contends that Hawaii's contractor ban should be tailored more narrowly, but narrower tailoring is not required here. There is no question the ban is closely drawn to the state's anticorruption interest as a general matter, and we decline to revisit the legislature's judgment not to craft a still narrower provision. Closely drawn scrutiny requires "a fit that is not necessarily perfect, but reasonable," and Hawaii's contractor contribution ban is a reasonable response to the strong appearance of corruption that existed at the time of the legislature's actions. *McCutcheon*, 134 S. Ct. at 1456 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) (internal quotation marks omitted). We need not "determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives" to uphold the contribution ban. *Randall*, 548 U.S. at 248.

Even if narrower tailoring were required, A-1's proposal for a narrower ban is unworkable. A-1 does not explain how it would determine, before the election, which candidates would neither award nor oversee any of its contracts. The membership of the various legislative committees can change with each election, and a different committee – whether the Education Committee or Public Safety, Government Operations, and Military Affairs Committee – may serve a greater or lesser oversight role on a particular project. There is, therefore, a "clear fallacy" in A-1's logic:

> [During the 2011 Legislative Session], A-1 testified . . . in favor of a construction and procurement-related bill regarding the University of Hawaii. At least three Legislators that served on committees that considered the bill (and voted in favor of it) also received campaign contributions from A-1 in the 2010 elections. And A-1 made contributions to opponents of fifteen other Legislators who considered the bill.

*Yamada III*, 872 F. Supp. 2d at 1061 n.30 (citation omitted). Simply put, A-1 cannot predict with certainty which candidates will not become involved in the contract award or oversight process when it makes its contributions. Moreover, A-1's contributions to candidates who do not become directly involved in contract award and oversight could still create the appearance of "the financial quid pro quo: dollars for political favors." *Citizens United*, 558 U.S. at 359 (quoting *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)) (internal quotation marks omitted).

For these reasons, we hold that Hawaii's government contractor contribution ban survives closely drawn scrutiny even as applied to A-1's proposed contributions to candidates who neither decide whether A-1 receives contracts nor oversee A-1's contracts.

## IV. Attorney's Fees

Finally, we consider the district court's fee award to Yamada and Stewart (the plaintiffs) for their successful constitutional challenge to the $1,000 limit on contributions

to noncandidate committees, HRS § 11-358. Under 41 U.S.C. § 1988(b), the district court had discretion to award "the prevailing party . . . a reasonable attorney's fee." We review the award for an abuse of discretion, but any element of legal analysis that figures into the district court's decision is reviewed de novo. *See Watson v. Cnty. of Riverside*, 300 F.3d 1092, 1095 (9th Cir. 2002). The plaintiffs' primary contention, with which we agree, is that the district court erred by refusing to award the fees they incurred in successfully defending against the defendants' interlocutory appeal. We address the plaintiffs' other contentions in a concurrently filed memorandum disposition.

In October 2010, the district court granted a preliminary injunction in favor of the plaintiffs on their claim that HRS § 11-358, limiting to $1,000 contributions to noncandidate committees, violates the First Amendment. The defendants then filed an interlocutory appeal. After the parties finished briefing in this court, however, the defendants dismissed the appeal, presumably in light of an intervening decision upholding a preliminary injunction of a similar contribution limit. *See Thalheimer*, 645 F.3d at 1117–21. In subsequent district court proceedings, the defendants offered to stipulate to a permanent injunction against § 11-358. The parties, however, were unable to reach agreement on the form of an injunction, and on the parties' subsequent cross-motions for summary judgment, the district court permanently enjoined § 11-358 as applied to the plaintiffs' proposed contributions.

Based on their successful constitutional challenge to § 11-358, Yamada and Stewart sought attorney's fees and costs, including those fees incurred in defending against the defendants' interlocutory appeal, under § 1988. The district court granted in part and denied in part their fee request. As

relevant here, it concluded it had "no authority" to award fees pertaining to the interlocutory appeal because (1) the plaintiffs became prevailing parties when the defendants abandoned their appeal of the preliminary injunction, *see Watson*, 300 F.3d at 1095 (stating that, under certain circumstances, "a plaintiff who obtains a preliminary injunction is a prevailing party for purposes of § 1988"), and (2) under Ninth Circuit Rule 39-1.6 and *Cummings v. Connell*, 402 F.3d 936, 940 (9th Cir. 2005) (*Cummings II*), "[a] district court is not authorized to award attorney's fees for an appeal unless we transfer the fee request to the district court for consideration." Because it assumed the plaintiffs could have requested fees from the Ninth Circuit as prevailing parties when the defendants dismissed their appeal, the court concluded it had no authority to award fees for the appeal.

The plaintiffs contend, and we agree, that the district court's analysis was flawed for two reasons. First, contrary to the district court's analysis, Yamada and Stewart were not yet prevailing parties when the defendants dismissed their interlocutory appeal and could not have requested fees at that time. A court may award attorney's fees under § 1988 only to a "prevailing party," and a plaintiff prevails for purposes of § 1988 only "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 715 (9th Cir. 2013) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)) (internal quotation marks omitted). This requires an "enduring" change in the parties' relationship, *Sole v. Wyner*, 551 U.S. 74, 86 (2007), that has "'judicial imprimatur' . . . such as a judgment on the merits or a court-ordered consent decree," *Watson*, 300 F.3d at 1096

(quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 600 (2001)).

The district court concluded that the plaintiffs were prevailing parties under *Watson*, but *Watson* is distinguishable. As explained in *Higher Taste*, *Watson* stands for the proposition that, "when a plaintiff wins a preliminary injunction *and the case is rendered moot before final judgment*, either by the passage of time or other circumstances beyond the parties' control, the plaintiff is a prevailing party eligible for a fee award." *Higher Taste*, 717 F.3d at 717 (emphasis added). Here, the plaintiffs' challenge to HRS § 11-358 was not "rendered moot" until the district court entered final judgment against the Commission on that claim. A plaintiff does not become a prevailing party until it obtains relief that is "no longer subject to being 'reversed, dissolved, or otherwise undone by the final decision in the same case.'" *Id.* (quoting *Sole*, 551 U.S. at 83). Here, that occurred when the district court entered a final judgment on the plaintiffs' § 11-358 claim, not when the Commission abandoned its appeal of the adverse preliminary injunction ruling.[19]

The defendants argue Yamada and Stewart were nonetheless prevailing parties at the time the defendants dismissed their interlocutory appeal because the preliminary

---

[19] *Higher Taste* extended *Watson*'s prevailing party analysis to circumstances in which a plaintiff obtains a preliminary injunction and then the case is dismissed upon the parties' stipulation following settlement, when the settlement agreement provides the plaintiff with "what it had hoped to obtain through a permanent injunction." 717 F.3d at 717–18. Here, however, the parties did not reach a settlement agreement at the time of the preliminary injunction appeal or any time thereafter.

injunction issued by the district court was not an "ephemeral" victory at all, but "a published opinion, resolving a constitutional question, enjoining a campaign finance law weeks before an election." That the preliminary injunction would be converted into a permanent one appeared to be a "foregone conclusion" to the parties and the district court, particularly once we issued our decision in *Thalheimer*.

We disagree. Because the preliminary injunction order could be negated by a final decision on the merits, it was an interlocutory order that did not confer prevailing party status on the plaintiffs when the defendants dismissed their appeal.

Furthermore, because the plaintiffs were not yet prevailing parties when the defendants dismissed the interlocutory appeal, the district court erred by relying on *Cummings II* to deny them attorney's fees for the appeal. *Cummings II* was the second appeal before this court in a case proceeding under § 1983. The district court granted summary judgment to the plaintiffs in the underlying case, and the defendant appealed that final order. In *Cummings v. Connell*, 316 F.3d 886, 898–99 (9th Cir. 2003) (*Cummings I*), we upheld the grant of summary judgment as to the defendant's liability, thus preserving the plaintiffs' status as prevailing parties on the merits, but remanded for reconsideration of damages. On remand, the district court awarded an additional $30,000 in attorney's fees the plaintiffs had incurred defending against the defendant's prior appeal in *Cummings I*. *Cummings II*, 402 F.3d at 942, 947. The parties cross-appealed again. We held that the fees related to the first appeal were improperly awarded "because plaintiffs failed to file their request with the court of appeals as required by Ninth Circuit Rule 39-1.6." *Id.* at 947. In short,

[p]laintiffs' application for attorneys' fees and expenses incurred on appeal in *Cummings I* should have been filed with the Clerk of the Ninth Circuit. Ninth Circuit Rule 39-1.8 authorizes us to transfer a timely-filed fees-on-appeal request to the district court for consideration, but the decision to permit the district court to handle the matter rests with the court of appeals. In the absence of such a transfer, the district court was not authorized to rule on the request for appellate attorney's fees.

*Id.* at 947–48.[20] *See Natural Res. Def. Council, Inc. v. Winter*, 543 F.3d 1152, 1164 (9th Cir. 2008) ("In *Cummings* [*II*], we held that appellate fees requested pursuant to 42 U.S.C. § 1988 must be filed with the Clerk of the Ninth Circuit in the first instance, not with the district court."). Accordingly, we reversed the attorney's fees award for the first appeal, holding that the plaintiffs' request for fees was untimely. *See Cummings II*, 402 F.3d at 948.

---

[20] Ninth Circuit Rule 39-1.6(a) reads:

Absent a statutory provision to the contrary, a request for attorneys' fees shall be filed no later than 14 days after the expiration of the period within which a petition for rehearing may be filed, unless a timely petition for rehearing is filed. If a timely petition for rehearing is filed, the request for attorneys fees shall be filed no later than 14 days after the Court's disposition of the petition.

This amended version of Ninth Circuit Rule 39-1.6 omits the "shall be filed with the Clerk" language of the prior version, but as the district court correctly concluded, the amendment did not alter the substance of the rule.

*Cummings II*, however, did not consider a situation in which a party prevails on interlocutory review and only *subsequently* becomes entitled to attorney's fees under a fee-shifting statute such as § 1988. When a plaintiff is not entitled to attorney's fees after an interlocutory appeal, as was the case here, it cannot immediately request attorney's fees from this court. Should the plaintiff subsequently become a prevailing party, however, it should presumptively be eligible for attorney's fees incurred during the first appeal, because that appeal likely contributed to the success of the underlying litigation. *See Crumpacker v. Kansas, Dep't of Human Res.*, 474 F.3d 747, 756 (10th Cir. 2007) (Title VII) (holding that "parties who prevail on interlocutory review in this court, and who subsequently become prevailing parties . . . are implicitly entitled to reasonable attorneys' fees related to the interlocutory appeal"); *cf. Cabrales v. Cnty. of L.A.*, 935 F.2d 1050, 1053 (9th Cir. 1991) (holding that "a plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage").

Here, because Yamada and Stewart prevailed in an interlocutory appeal, and subsequently became prevailing parties after the district court entered judgment in their favor, the district court erred by failing to consider whether to award them reasonable appellate attorney's fees. We hold that Yamada and Stewart are entitled to attorney's fees arising from the prior appeal. The matter is referred to the Ninth Circuit Appellate Commissioner to determine the amount of fees to be awarded.[21]

---

[21] The plaintiffs further argue Ninth Circuit Rule 39-1.6 cannot restrict the jurisdiction of the district court to award attorney's fees related to a prior appeal where a fee-shifting statute, such as § 1988, does not preclude

## V. Conclusion

We affirm the judgment of the district court on the merits of A-1's constitutional claims. We vacate the district court's fee award to Yamada and Stewart in part and refer the matter to the Ninth Circuit Appellate Commissioner for a determination of the proper fee award arising out of the interlocutory appeal. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART; REFERRED TO THE APPELLATE COMMISSIONER WITH INSTRUCTIONS**.

---

the district court from awarding such fees. The Eighth Circuit agreed with this position in *Little Rock School District v. State of Arkansas*, 127 F.3d 693, 696 (8th Cir. 1997), where it held that, despite an analogous Eighth Circuit rule to our Rule 39-1.6, "the district courts retain jurisdiction to decide attorneys' fees issues that we have not ourselves undertaken to decide." Although the plaintiffs' argument has some appeal, we are bound by our contrary holding in *Cummings II*.